UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ESTHER KIOBEL, individually and      :
in behalf of her late husband,
DR. BARINEM KIOBEL, et al.,          :

              Plaintiffs,   :   02 Civ. 7618 (KMW)(HBP)

  -against-                          :
                             OPINION
ROYAL DUTCH PETROLEUM COMPANY,       :   AND ORDER
et al.,
                       :

              Defendants.   :
----------------------------------X

        PITMAN, United States Magistrate Judge:


I.  Introduction

        In Docket Item 98, plaintiffs move for an Order impos-
ing sanctions pursuant to Fed.R.Civ.P. 11(b)(3) on the ground
that Defendants' Response to Plaintiffs' Objections to the Report
and Recommendation of March 31, 2004, dated May 24, 2004 (Docket
Item 72) ("May 24 Response") contains three assertions of fact
that lacked evidentiary support.  For the reasons set forth
below, plaintiffs' motion is granted in part and denied in part.

II.  Facts

        This action, along with Docket Nos. 96 Civ. 8386 and 01
Civ. 1909, is a human rights action in which plaintiffs allege
that defendants colluded with the former Nigerian government to

violate the rights of the Ogoni people in response to their
protests concerning petroleum development activities in the
vicinity of their villages and farms.  The allegations in this
matter are substantially similar to the allegations in Docket
Nos. 96 Civ. 8386 and 01 Civ. 1909 which are summarized in my
Opinion and Order dated September 12, 2006.  <u>Wiwa v. Royal Dutch</u>
<u>Petroleum Co.</u>, 96 Civ. 8386 (KMW)(HBP), 2006 WL 2637836 (S.D.N.Y.
Sept. 12, 2006).

On March 31, 2004, I issued a Report and Recommendation
recommending that plaintiffs' motion for class certification be
denied.  Although I found that certain factors weighed against
class certification, I affirmatively concluded that plaintiffs'
counsel was clearly adequate.  Specifically, I wrote

> Plaintiffs' counsel has submitted a compendium of
> cases with its memorandum of law setting forth coun-
> sel's victories in a multitude of other federal class
> actions involving a wide range of subject matters
> (Plaintiffs' Mem. Ex. A).  Included in this compendium
> are quotations from twelve different District Judges'
> praise for the work of plaintiffs' counsel, including
> the following comment from the Honorable John F.
> Keenan, United States District Judge, of this District:
>
>> The quality of work of plaintiffs' counsel on this
>> case is also demonstrated by the efficient manner
>> of prosecution. . . .  At the settlement hearing,
>> defense counsel conceded that plaintiffs' counsel
>> constitute the "cream of the plaintiffs' bar."
>> The court cannot find fault with that character-
>> ization.
>
> (Plaintiffs' Mem. Ex. A at 10).
>
> Defendants['] only substantial gripe with plain-
> tiffs' counsel is their contention that counsel failed

2

to comply with certain discovery obligations.  The discovery dispute cited by defendants has, however, been resolved, substantially in plaintiffs' favor.

In light of their record in other cases and in this case, I find that plaintiffs' counsel will adequately represent the interests of the class.

Although defendants did not file objections to my Report and Recommendation, plaintiffs did.  Defendants filed their May 24 Response in opposition to plaintiffs' objections which contained three statements that give rise to the present motion:

"Now we have learned that seven of the identified witnesses are being paid for their testimony."

"There can be no doubt that the witnesses are giving testimony that counsel know to be false."

"[W]e know that between February 29, 2004 and April 2, 2004, Berger & Montague wired $15,195 to the Benin republic for the benefit of the witnesses."

(May 24 Response at 20 & 20 n.27).

Plaintiffs contend that all three statements violate Rule 11(b)(3) because they have no evidentiary support.  Defendants argue that all three statements are supported by the evidence.

III.  Analysis

A.  Applicable Legal Standards

Rule 11(b)(3) of the Federal Rules of Civil Procedure provides:

3

**(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, --

(3) the allegations and other factual contentions have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

In ruling on a motion for sanctions, "the court is to avoid hindsight and resolve all doubts in favor of the signer." Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir. 1986). "With regard to factual contentions, 'sanctions may not be imposed unless a particular allegation is utterly lacking in support.'" Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 388 (2d Cir. 2003), quoting O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996). As the Court of Appeals noted last year,

Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy. Although the imposition of sanctions is within the province of the district court, "any such decision [should be] made with restraint and discretion." Schlaifer Nance & Co., Inc. v. Estate of Warhol, 194 F.3d 323, 334 (2d Cir. 1999).

Pannonia Farms, Inc. v. USA Cable, 426 F.3d 650, 652 (2d Cir. 2005).

"The mental state applicable to liability for Rule 11 sanctions initiated by motion is objective reasonableness, i.e.,

liability may be imposed if the lawyer's claim to have eviden-
tiary support is not objectively reasonable."  In re Pennie &
Edmonds LLP, 323 F.3d 86, 90 (2d Cir. 2003); see Ted Lapidus,
S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997); O'Brien v. Alexan-
der, supra, 101 F.3d at 1490.  In assessing whether a claim of
evidentiary support is objectively reasonable, a court should
focus "upon the objective meaning of the words used rather than
the attorney's creative post hoc explanation."  O'Brien v.
Alexander, supra, 101 F.3d at 1490.  Thus,

> a court cannot rely on hindsight in assessing the
> propriety of an attorney's conduct, but must instead
> base its award on the particular facts that were rea-
> sonably accessible to the attorney at the time of the
> signing.  Accordingly, a court must look to the objec-
> tive reasonableness of an attorney's actions under the
> circumstances known to him or her at the time the
> questionable document was signed.

McLoughlin v. Altman, 92 Civ. 8106 (KMW), 1995 WL 640770 at *2
(S.D.N.Y. Oct. 31, 1995).  The sole exception is where a party
makes "a specific disclaimer that additional investigation is
necessary."  O'Brien v. Alexander, supra, 101 F.3d at 1489.
Finally, imposition of Rule 11 sanctions as a result of a motion
does not require a finding of subjective bad faith.  Ted Lapidus,
S.A. v. Vann, supra, 112 F.3d at 96; Wechsler v. Hunt Health
Sys., Ltd., 216 F. Supp.2d 347, 356 (S.D.N.Y. 2002).

B.   <u>Defendants' Counsel's Statements</u>

1.   "Now we have learned that
     seven of the identified
     witnesses are being paid
     <u>for their testimony."</u>

This statement has its origin in the fact, freely admitted by plaintiffs, that plaintiffs' counsel paid for and assisted in the transportation of seven individuals and their families from Nigeria to the neighboring Benin Republic.[1]  Plaintiffs contend that these individuals feared retaliation if they gave testimony unfavorable to the Nigerian government and remained in Nigeria and that their relocation was, therefore, necessary to ensure their safety and that of their families. Accordingly, plaintiffs' counsel assisted their transport to the Benin Republic, and provided lodging and subsistence for them there.[2]  The assistance provided by plaintiffs' counsel included food, clothing, lodging, medical care and entertainment.[3]  Al

---

[1]The seven individuals, referred to collectively herein as the "Benin Witnesses" are Boniface Egiogwu, Lete Allens Gbarale, Blessing Israel, Raphael Kponee, Vincent Tornebamri Nwidoh, Eebu Jackson Nwiyon and Prince Osaror.

[2]Defendants contend that plaintiffs counsel caused the Benin Witnesses to be smuggled into Benin illegally and that they have no legal status in the country.  I shall assume the truth of this allegation.  Nevertheless it is irrelevant to the present motion. A witness's immigration status in the country in which he or she testifies is immaterial to the witness's competence.

[3]The entertainment items identified by defendants consist of
(continued...)

though the parties dispute the precise amount of financial
assistance provided to the Benin Witnesses and their families,
even if I view the evidence in the light most favorable to
defendants' counsel, the amount is less than $16,000.

Although defendants' counsel makes a number of argu-
ments concerning whether the relocation payments violated statu-
tory or professional ethical prohibitions, those arguments miss
the point; the only issue here is whether there was an eviden-
tiary basis for the statement that the Benin Witnesses were
"being paid for their testimony" by plaintiffs' counsel.  Defen-
dants' counsel cites no direct evidence on this issue.

The closest defendants' counsel comes to citing evi-
dence for their statement is the hearsay declaration of Michael
T. Reynolds, dated August 5, 2004 ("Reynolds Decl.") in which Mr.
Reynolds describes a conversation he had with an unidentified
former employee ("Anonymous Ex-employee") of Shell Petroleum
Development Company of Nigeria, Limited ("SPDC") in July 2004.
According to Mr. Reynolds, the Anonymous Ex-employee stated that
he received a telephone call on an unspecified date from Keith
Mabray, an individual who plaintiffs admit is one of their
investigators, and that Mabray said he was working for the

---

[3](...continued)
a DVD player, books, games and a football (Defendants' Memorandum
of Law in Opposition to Plaintiffs' Motion for Rule 11 Sanctions,
dated August 5, 2004 ("Defendants' Memo."), (Docket Item 123) at
5).

"'Ogoni legal team.'"   Mr. Reynolds recounts that Anonymous Ex-employee stated that he met with Mabray on a second unspecified date and that the following took place:

> a.  Mr. Mabray told the former employee that he was looking for witnesses in the Niger Delta who would be willing to testify in the case.
>
> b.  Mr. Mabray told the former employee that there was a lot of money in the case and that he believed that those who signed up to testify would be "rewarded very, very well".
>
> c.  Mr. Mabray told the former employee that the "Ogoni legal team" would be prepared to relocate the former employee outside of Nigeria if he agreed to testify.
>
> d.  Mr. Mabray told the former employee that if he was interested, the "Ogoni legal team" would send him to the United States to meet with the "bigger boys", who were the lawyers actually handling the case in the United States.
>
> e.  The former employee told Mr. Mabray that he would think it over and get back to him.
>
> f.  Mr. Mabray gave the former employee his business card.

(Reynolds Decl. ¶ 6(a-f)).[4]

---

[4]Defendants do not explain why they have not offered an affidavit from Anonymous Ex-employee him or herself.  Plaintiffs have submitted a declaration from Mr. Mabray in which he describes his conversations with Mr. Steve Lawson-Jack, who he believes to be the Anonymous Ex-employee, and denies offering or suggesting that plaintiffs or their counsel were willing to pay for testimony (Declaration of Keith G. Mabray, annexed as Exhibit A to Plaintiffs' Reply Brief in Support of their Motion for Rule 11 Sanctions, dated September 20, 2004 ("Plaintiffs' Reply Brf.")).

Crediting the foregoing report from Anonymous Employee, defendants' counsel goes on to infer that there was a "presumptively similar offer to reward the Benin Witnesses" (Defendants' Memo. at 4) and concludes that the statements of the Anonymous Ex-employee support the statement that "seven of the identified witnesses are being paid for their testimony."

This argument is not persuasive.  Mr. Reynolds' Declaration states that he had his conversation with Anonymous Ex-employee on an unspecified date in July 2004.  The statement plaintiffs are challenging here is the statement made by defendants' counsel in their May 24, 2004 Response that "[n]ow we have learned that seven of the identified witnesses are being paid for their testimony" (emphasis added).  The information from Anonymous Ex-employee was obtained two months after the challenged statement and could not, therefore, have been the evidentiary support for it.

Nevertheless, at the time of defendants' counsel's statements, defendants' counsel did have records of the payments made to the Benin Witnesses and their families, and those records indicate that payments had been made for the benefit of the Benin Witness in excess of travel and subsistence for the witnesses themselves for the duration of the deposition.  At least one court has stated in dicta that if the compensation paid to a witness "seems unreasonably high or disproportionate to the time

actually spent on litigation matters, then an inference could be drawn that the payments, in reality, were made for the substance or efficacy of [the witness's] testimony," Centennial Mgmt. Servs., Inc. v. Axa Re Vie, 193 F.R.D. 671, 679-680 (D. Kan. 2000). Given these facts and the dicta in Centennial Mgmt., I cannot conclude that defendants' counsel's statement was utterly without evidentiary support.

Accordingly, the imposition of sanctions for defendants' counsel's statement that "[n]ow we have learned that seven of the identified witnesses are being paid for their testimony" is not justified.

> 2. "There can be no doubt
>    that the witnesses are
>    giving testimony that
>    counsel knows to be false."

Defendants' counsel argues that their statement that plaintiffs' witness were giving testimony that plaintiffs' counsel knew to be false[5] is supported by the testimony of the two Benin Witnesses who had been deposed prior to the submission of the May 24 Response -- Prince Osaror and Boniface Ejiogu.

---

[5]Although there is some ambiguity concerning which set of counsel their statement refers to, defendants' counsel do not argue that they were referring exclusively to their own knowledge. Accordingly, since all counsel construe the statement as referring to plaintiffs' counsels' knowledge, I shall construe the statement in the same manner.

a.  <u>Prince Osaror's Testimony</u>

First, defendants' counsel argues that Prince Osaror gave testimony that was false in nine different respects of which plaintiffs' counsel was aware.

1.  <u>Osaror's testimony that in 1994 and 1995, he wrote and sent reports to the Complaint Department of the Nigerian Ministry of Defense, located on the 13th Floor of the "Race Course" building and that he took reports from that office at that location in 2003</u>.[6]

Defendants' counsel claims that this testimony was false because the Race course building suffered a fire in April 1993 and has been uninhabitable ever since.  In support of their argument, defendants' counsel offers an affidavit from SPDC's Corporate Security Coordinator in Nigeria (Declaration of Michael Achu, dated August 4, 2004) and a reprint of a news article from 1993 (Declaration of Gary A. Bornstein, dated August 5, 2004 ("Bornstein Decl."), Ex. 23).

Even if I assume that Osaror's testimony was false and that the Race Course building has, in fact, been uninhabitable since 1993, defendants' counsel offers no evidence that plain-

_____

[6]Plaintiffs make a non-frivolous argument that Osaror's testimony on this subject is not as clear as defendants describe it to be (Plaintiffs' Reply Brf. at 11-13).  Since it does not affect the outcome of the motion, I shall assume the accuracy of defendants' description of the testimony.

tiffs' counsel knew the testimony was false.  Although defendants' counsel argues that the condition of the Race Course building was readily ascertainable had plaintiffs' counsel had visited it in Lagos, defendants' counsel cites no legal or ethical authority that would have required counsel to undertake such an investigation.  To the contrary, the Advisory Committee Notes to the 1970 Amendments to Rule 11 expressly state that the Rule "does not impose a duty to check the accuracy of prior responses . . . ."

Thus, defendants' counsel have failed to establish an evidentiary basis for their contention that plaintiffs' counsel knew Osaror's testimony concerning what he did at the Race Course wasfalse.

2.  <u>Osaror's testimony that Shell bribed a Nigerian military officer by granting a contract to perform work at "Shell's Eleme refinery."</u>

Defendants' counsel contends that this testimony was false and was known to plaintiffs' counsel to be false because the Eleme refinery was owned by the Nigerian government at all relevant times.

In support of their contention, defendants' counsel cites four excerpts from Osaror's deposition -- pages 111-14 of the transcript dated May 20, 2004 and pages 75-76, 80-83 and 90-92 of the transcript dated May 21, 2004 (Defendants' Memo. at

12

13).  Plaintiffs' counsel conducted the examination on the first group of pages cited by defendants; there is no reference in the cited passage of plaintiffs' examination referring to any refinery owned by Shell.  In the second group of pages, it is defendants' counsel who refers to the refinery as being Shell's refinery; Osaror never agreed with a question at the pages cited that the refinery was Shell's refinery (see Plaintiffs' Reply Brf. at 14-15).

Thus, defendants' counsel has failed to establish an evidentiary basis for their contention that Osaror gave false testimony concerning the Eleme refinery or that plaintiffs' counsel knew any testimony concerning this subject was false.

3.  Osaror's testimony that some SPDC employees wore an identification card reading "Shell BP," that SPDC delivered food to soldiers in containers bearing the words "Shell BP," and that he saw helicopters bearing a "Shell BP" logo.

Defendants' counsel claims that this testimony is false because the Nigerian government nationalized BP's interest in the 1970's.

Defendants have not established a basis for their contention that Osaror's testimony was false.  The fact that a business entity is nationalized or otherwise defunct does not mean that its logo or name is necessarily removed from its physical plant and equipment or even employee identification

documents.  Within blocks of the courthouse there are a number of buildings and signs that bear the names of now-defunct entities.

The nationalization of BP's interest does not provide an evidentiary basis for believing that Osaror's testimony in this regard was false and clearly does not provide a basis for the statement that plaintiffs' counsel knew it was false.

4.  <u>Osaror's testimony that he saw SPDC pay 56 million Naira to a Nigerian military officer by delivering the currency in seven "Ghana Must Go" bags</u>.

Defendants' counsel claims that given the dimensions of a "Ghana Must Go" bag, this testimony defies the laws of physics because that amount of Nigerian currency could not possibly fit in a "Ghana Must Go" bag (Defendants' Memo. at 14).  Unfortunately, defendants offer no evidence concerning either the dimensions of a "Ghana Must Go" bag,[7] or the volume occupied by a 50 or 20 Naira note.

---

[7]With respect to the dimensions of a "Ghana Must Go" bag, defendants' counsel offers only the following testimony from Mr. Ejiogu's deposition:

> Q.   Using your hands, about how wide were the Ghana Must Go bags?
>
> A.   It is like this.
>
> Q.   How deep were they, would you put your hand on the table.  How high were they?
>
> A.   Okay.

(Defendants' Memo. at 14 n.21).

Again, even if I assume that defendants are correct and that it is physically impossible to place 56 million Naira in seven "Ghana Must Go" bags, defendants' counsel cites no evidence that plaintiffs' counsel knew this testimony was false.

Thus, defendants' counsel has failed to cite an evidentiary basis for their contention that plaintiffs' counsel knew that Osaror's testimony concerning the alleged payment of 56 million Naira was false.

5.  <u>Osaror's report and testimony that "'Shell BP voted 9.5 Billion Naira through Abacha for the operation in Ogoni Kingdom crises [sic]</u>.'"

Defendants claim that this testimony was false because Osaror testified that he prepared the report in either 1995 or 1996 and also acknowledged that had he filed such a report with the Nigerian Ministry of Defense prior to General Abacha's death in 1998, Osaror would have been executed (Defendants' Memo. at 15).

This testimony was elicited by defense counsel during their cross examination of Osaror (Bornstein Decl. Ex. 14 at 123).  Thus, Osaror's testimony was not sponsored or relied upon by plaintiffs' counsel.  Moreover, the testimony seems like little more than a garden-variety inconsistency in a witness's testimony that defense counsel had the opportunity to probe and explore.  The apparent inconsistency may have been the result of

15

the witness's ignorance, limitations with language or a misunder-
standing.  In any event, apparently inconsistent testimony does
not sustain an inference that plaintiffs' counsel knowingly
permitted a witness to commit perjury.

      6.  <u>Osaror's testimony that Shell BP located a ware-
house for the Nigerian Army to use as a secret detention facil-
ity</u>.

      Defendants' counsel contends that this statement was
false because, among other things, other Benin Witnesses testi-
fied that the warehouse in issue was owned by the Nigerian
government (Defendants' Memo. at 15-16).

      Defendants' counsel's arguments here are particularly
weak.  First, Osaror's testimony that Shell BP found the facility
for the Nigerian Army does not imply that Shell BP owned the
warehouse; there is simply no inconsistency in the evidence on
this point.  Second, even if there was an inconsistency in the
testimony, it does not imply that plaintiffs' counsel knew the
testimony was false.  Where multiple witnesses observe the same
events, their testimony frequently contains inconsistencies;
indeed, the presence of these inconsistencies is sometimes
offered evidence that the witnesses are testifying truthfully.
Inconsistencies among witnesses to the same event are an inevita-
ble consequence of human perception; it is not evidence of

perjury, and clearly is not evidence that counsel is knowingly offering or tolerating perjured testimony.

7.   <u>Osaror's report and testimony about a purported "interview" with Ken Saro-Wiwa in detention on June 15, 1995 in which Mr. Saro-Wiwa allegedly said that he had been in chains for 65 days</u>.

Defendants' counsel claims that this testimony was false because it is contradicted by a letter from Saro-Wiwa to his son stating that he is in "good sprits" and thanking his son for a computer, honey and video diskettes (Defendants' Memo. at 16 n.25).

Defendants' counsel's arguments appear to misapprehend Osaror's testimony.  Osaror's testimony and the underlying report do not purport to establish how long Saro-Wiwa was actually "in chains;" rather, Osaror was testifying to what Saro-Wiwa told him.  The statement could have been a metaphorical usage of the word "chains" by Saro-Wiwa that Osaror misunderstood, or it could have been a misrepresentation by Saro-Wiwa.  How long, if at all, Saro-Wiwa was actually chained up does not bear on what he told Osaror.

In any event, even if contrary evidence concerning the conditions of Saro-Wiwa's provided a basis for defendants' counsel to disbelieve this aspect of Osaror's testimony, it did

not provide a basis for counsel's statement that plaintiffs' counsel knew that the testimony was false.

    8.  Osaror's testimony concerning the characteristics of a cesspool on an SPDC farm in Bori, Ogoniland and whether it was possible to store weapons in and retrieve weapons from such a cesspool.

    Defendants' counsel claims that this testimony was false because their witness stated that the cesspools were sealed cement structures that could not be opened without breaking the cement (Declaration of Suoton Amade, dated August 4, 2004 ("Amade Decl."), ¶ 6).

    Although contradictory evidence, obtained long after the deposition, may provide an evidentiary basis for the statement that Osaror's testimony concerning the cesspools was false, it does not establish or imply that plaintiffs' counsel knew that the testimony was false.

    9.  Osaror's testimony that Shell had a $260 billion contract with ADAMAC.

    Defendants' counsel contends that this testimony was false because SPDC's pre-tax expenses during the relevant time period were approximately $1 billion per year and Nigeria's annual gross national product in the relevant time period was only approximately $30 billion per year (Defendants' Memo. at 17-18).

18

Again, the testimony upon which defendants' counsel relies was elicited by defendants' counsel (Bornstein Decl. Ex. 14 at 199).  Plaintiffs did not sponsor it and there is no evidence that plaintiffs' counsel even knew that Osaror was going to give this testimony prior to the deposition.  In addition, defendants did not seek any clarification or explanation of the testimony.  It may well be that the witness was referring to a multi-year or multi-decade contract; the witness may have been confusing units of currency; the witness may have been confusing billion and million or the witness may have just been wrong.  In any event, even if the testimony by Osaror concerning the size of the contract was an intentional falsehood, there is no evidence that plaintiffs' counsel knew that it was false as opposed to being the result of a mistake or a misunderstanding.

b.  Boniface Ejiogu's Testimony

Next defendants' counsel argues that Boniface Ejiogu's testimony that was false in five different respects of which plaintiffs' counsel was aware.

1.  Ejiogu's testimony that he accompanied Major Okuntimo to the home of a certain SPDC employee.

Defendants' counsel claims that this testimony is inherently implausible and contradicted by the testimony of one other Benin Witnesses (Defendants' Memo. at 18).

Apart from the inconsistencies between Ejiogu and the other Benin Witnesses defendants' counsel offers no evidence of falsity and no evidence that plaintiffs' counsel knew the testimony was false.  Thus, no evidentiary basis at all is cited for defense counsel's contention that plaintiffs' counsel knew the statement was false.

2.  <u>Ejiogu's testimony that he gave cash to Major Okuntimo in "Ghana Must Go" bags</u>.

Defendants' counsel's arguments concerning this testimony border on being ludicrous.  Defendants' counsel states:

> Mr. Ejiogu testified that SPDC's "James Udofia" . . . was present for this payment and that Mr. Udofia "is a big man physically."  (Ex. 10 (Ejiogu 5/22/04 Tr. 100-01; Ejiogu 5/23/04 Tr. 165-66).)  By the time of Mr Ejiogu's testimony, counsel had twice met and deposed Mr. Udofia, who is not a "big man."  In addition, Mr. Ejiou's testimony that Major Okuntimo instructed him and his colleagues to "carry this money to the boot" of the car (Ex. 10 (Ejiogu 5/22/04 Tr. 101)) is inconsistent with his testimony that when one of the bags later broke, another soldier uttered with surprise "wow this is money" (<u>id</u>. at 38).

(Defendants' Memo. at 18-19).

Because Udofia's size is not a material fact, charging adverse counsel with condoning perjury based on a Ejiogu's description of Udofia's size does nothing but demonstrate the poverty of defendants' counsels' position.  Moreover, Udofia's size at the time counsel met him does not bear on his size at the time of the events described by Ejiogu; some people gain weight over time, some people lose weight over time and some neither

lose nor gain weight.  In addition, as the testimony is described
by defendants's counsel above, there is no inconsistency between
Ejiogu's testimony concerning the placement of the money in the
trunk of Okuntimo's car and the later statement attributed to the
soldier.  There is no contention that the soldier was present
when the money was loaded or that he had a way of knowing the
contents of the bags before they broke open.

Defendants' counsel has provided no evidence that
Ejiogu's testimony concerning the cash delivery was false and not
a shred of evidence that plaintiffs' counsel knew it was false.

3.  Ejiogu's testimony that he had not returned to
Nigeria since leaving in September 2003.

Defendants' counsel claims that this testimony is false
because another witness, Dornubari Anslem John-Miller, testified
that Ejiogu returned to Nigeria in October 2003 to meet with his
attorneys and cites pages 226-34 of the John-Miller deposition
transcript in support of their argument (Defendants' Memo. at
19).  In fact, the cited passage of the John-Miller deposition
transcript refers to a trip by Ejiogu to Nigeria in September
2003 (Bornstein Decl. Ex. 3 at 226-27); there is no reference to
an October 2003 meeting in the passage cited by defendants.

Again, there is no evidentiary basis for the contention
that the testimony was false or that plaintiffs' counsel knew it
was false.

4.   <u>Ejiogu's testimony that SPDC called Major Okuntimo</u>
<u>to quell a protest of Ogoni people at the gate of the SPDC</u>
<u>Industrial Area in Port Harcourt</u>.

Defendants' counsel claims that this testimony is false
because a report from Human Rights Watch states that "[t]he only
protest outside the SPDC Industrial Area for which Paul Okuntimo
was reportedly present involved the Rumuobiokani people not the
Ogoni" (Defendants' Memo. at 19, <u>citing</u> Bornstein Decl. Ex. 38 at
K01128).

The support for defendants' counsel's contention that
Ejiogu's testimony was false does not exist.  Although the
document cited does describe a disturbance involving the
Rumuobiokani people on February 21, 1994, it does not negate
Okuntimo's presence at other disturbances and does not even
obliquely suggest that Ejiogu's testimony is false or that
plaintiffs' counsel knew it was false.  Defendants' argument
concerning this aspect of Ejiogu's testimony is frivolous.

5.   <u>Ejiogu's testimony concerning the storage of</u>
<u>weapons in a cesspool and presence of Shell Security civilians at</u>
<u>Shell's Bori Farm</u>.

To the extent that defendants' counsel's argument is
based on Ejiogu's testimony concerning the physical characteris-
tics of the cesspool, the discussion at page 18, above applies
with equal force here.

To the extent that defendants' counsel is claiming that Ejiogu's testimony concerning the presence of Shell personnel at the Bori Farm is false, they rely exclusively on the statements of an SPDC employee to the contrary (Amade Decl. ¶¶ 4-5). Even if this information provides a basis for believing that Ejiogu's testimony is false, it provides no basis for the statement that plaintiffs' attorneys knew the testimony was false.

c.  Testimony of Other Witness

Defendants's counsel also attempts to defend the statements in their May 24 Response by citing the testimony of other Benin Witness who testified on or after the May 24 Response was submitted (Defendants' Memo. at 20-22). I do not consider this argument because it is based on testimony that post-dates the May 24 Response and could not, therefore, have been the basis for the statements made there.[8]

_____

[8]As noted above, Rule 11(b)(3) provides that by submitting a pleading, written motion or other paper, counsel certifies that the "the allegations and other factual contentions have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further discovery . . . ." Defendants' counsel attempts to justify its reliance on discovery conducted after the May 24 Response by citing the following passage from that document:

> Although the witnesses are currently being deposed in Benin and the transcripts are this not yet available, there can be no doubt that the witnesses are giving testimony that counsel knows to be false. There will be further discovery into the question of who caused
> (continued...)

d.   <u>Summary</u>

As the foregoing demonstrates, although it appears that defendants had some basis for claiming that some of the testimony by Osaror and Ejiogu given prior to May 24, 2004 was false, they had no basis for their statement that plaintiffs' counsel knew any of the testimony was false.  Thus, I conclude that defendants' statement that plaintiffs' counsel knew that the Benin Witnesses were giving false testimony violated Rule 11.

---

[8](...continued)
these witnesses to give obviously false testimony.

(May 24 Response at 20 n.27).

This attempt to invoke the Rule 26(b)(3)'s disclaimer provision is not persuasive.  Defendants' counsel did not state that they expected to develop evidence that plaintiffs' counsel knew the testimony was false; defendants' counsel said that, as of May 24, 2004, "<u>there</u> <u>can</u> <u>be</u> <u>no</u> <u>doubt</u> that the witnesses are giving testimony that counsel knows to be false."  (Emphasis added).  Defendants did not remotely suggest that additional discovery was necessary to establish plaintiffs' counsel's alleged knowledge of the false testimony.  The reference to future discovery was a reference to defendants' counsel's belief that additional discovery would disclose additional wrongdoers.  Thus, defendants' counsel's attempt to rely on Rule 11(b)(3)'s disclaimer provision is misplaced.

3.  "[W]e know that between
    February 29, 2004 and
    April 2, 2004, Berger &
    Montague wired $15,195 to
    the Benin Republic for
    <u>the benefit of the witnesses</u>."

Plaintiffs' material grievance with the foregoing statement is that it overstates the amount.

The bases for defendants' statement are documents produced by plaintiffs in May 2004; the pertinent documents are annexed as Exhibit E to Plaintiffs' Memorandum in Support of the Motion for Rule 11 Sanctions and evidence the following transfers to either Nigeria or the Benin Republic:

| | | |
|---|---|---|
| 02-29-04 | $1,200.00[9] | (Kiobel 003059 (top half)[10]) |
| 03-12-04 | $5,000.00 | (Kiobel 003000, 003054) |
| 03-12-04 | $1,886.00[11] | (W10-11) |
| 04-02-04 | $6,895.00 | (Kiobel 003059 (bottom half)) |
| **TOTAL** | **$14,981.00** | |

---

[9]Plaintiffs state that the amount of this transfer is $1,300.00; the underlying document reflects a figure of $1,200.00 (Plaintiffs' Memo at 11).

[10]The parenthetical information after the amounts indicates the particular page within Exhibit E to Plaintiffs' Memorandum that reflects the transmission of funds listed.

[11]Defendants' counsel has overlooked the $114.00 service fee associated with this transfer and values this transfer at $2,000.00 (Defendants' Memo at 24; <u>see</u> Plaintiffs' Memo., Ex. E at W11).

Plaintiffs' only substantial claim of inaccuracy relates to the March 12, 2004 transfer of $5,000.00.  Plaintiffs claim that the documents relating to this transfer indicate that $3,000.00 of the transfer was to be applied to the balance owed to plaintiffs' investigator in Nigeria (Plaintiffs' Memo. at 11-12).

There are two e-mails concerning the $5,000 transfer.  The first is dated March 12, 2004 and was sent from plaintiffs' counsel to "Keith."  It states:

> Keith, I have authorized a $5,000.00 wire transfer to your account.  Please reimburse your outstanding balance and begin a regular twice monthly distribution of food money to the witnesses in Benin of 5,000 Sofars per person per day.

(Plaintiffs' Memo., Ex. E at Kiobel 003000).  The second e-mail is from an unidentified sender to plaintiffs' counsel.  It states:

> $5,000.00 was sent to me by Carey on 3/12/04.  I was advised by Carey that $3,000.00 of that money was used to pay me back for the money that was owed to me by the United States based Ogoniâ€™s [sic] for the past months that we were never reimbursed for.  The remaining $ 2000.00 was then forwarded to our folks in Benin to distribute to the witnesses.

(Plaintiffs's Memo., Ex. E at Kiobel 003054).  Plaintiffs claim that the second e-mail makes clear that $3,000 of the $5,000 was allocated to a pre-existing balance unrelated to the Benin Witnesses.  Defendants' counsel offers two sentences to justify

their inclusion of this $3,000.00 in their calculation of the sum sent to the Benin Witnesses:

> Nor is there any reasons for excluding the $3,000 that plaintiffs assert was used to reimburse MPTC Security for expenses "incurred on behalf of the United States based Ogonis." (Pl. Mem. 11). Even if that were true, the "expenses" of the "United States based Ogonis" went toward supporting the Benin Witnesses (see, e.g., Ex. 6 (Kponee Tr. 205-06); Ex. 7 (Gbarale Tr. 155-66)), so that Berger & Montague's reimbursement of those "expenses" was also "for the "benefit of the witnesses."

(Defendants' Memo at 23-24).

Defendants' explanation is unconvincing.  First, Kponee was deposed on May 26, 2004 and Gbarale was deposed on May 27, 2006 (Bornstein Decl. Exs. 6 at 2 and 7 at 2).  Thus, their testimony could not have been known to defendants' counsel at the time the May 24 Response was filed.  Second, although Kponee and Gbarale testified on the pages cited by defendants that individuals in the United States sent them money, there is no evidence connecting the $3,000 reimbursement for sums paid to the "United States based Ogoni[s]" with the money sent to Kponee and Gbarale.

Thus, it does appear that defendants' counsel's statement that "we know that between February 29, 2004 and April 2, 2004, Berger & Montague wired $15,195 to the Benin Republic for the benefit of the witnesses" overstated the amount sent by $3,000 or approximately twenty-five percent.

Plaintiffs' counsel also claims that the statement is inaccurate because (1) some of the funds for the benefit of the

Benin Witnesses were sent to Nigeria, not the Benin Republic as represented by defendants' counsel; (2) some of the funds were not actually sent by Berger & Montague, although Berger & Montague does not disclaim knowledge of the remissions, and (3) some of the funds were for future expenses of the Benin Witness as opposed to current expenses.  Although these latter three complaints appear to be well grounded, they are trivial.  In light of their triviality, as a matter of discretion, I decline to consider them as a basis for sanctions.  See Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004) (decision to impose Rule 11 sanctions is discretionary).

      4.   Summary

      Thus, for all the reasons stated above, I find that defendants' counsels' statement "Now we have learned that seven of the identified witnesses are being paid for their testimony" did not violate Rule 11.  However, that counsels' statements "[t]here can be no doubt that the witnesses are giving testimony that counsel know to be false" and "we know that between February 29, 2004 and April 2, 2004, Berger & Montague wired $15,195 to the Benin republic for the benefit of the witnesses" lacked an evidentiary basis and did violate Rule 11.

C.   The Appropriate Sanction

        Although I find that two of defendants' counsels'
statements violated Rule 11, as a matter of discretion,  I
decline to award sanctions concerning the third statement, "we
know that between February 29, 2004 and April 2, 2004, Berger &
Montague wired $15,195 to the Benin Republic for the benefit of
the witnesses."  Although defendants' counsel overstated the
amount of money sent to benefit the Benin Witnesses, the amount
of the overstatement was small (approximately $3,000) and did not
materially change the nature of the statement -- specifically
that financial benefits beyond transportation and subsistence for
the duration of the deposition were being provided to the Benin
Witnesses.  Given this fact and the Court of Appeals' admonition
that a court should act with  "restraint and discretion" in
ruling on a motion for sanctions, Schlaifer Nance & Co. v. Estate
of Warhol, 194 F.3d 323, 334 (2d Cir. 1999), I conclude that the
better course is not to award sanctions for this statement.

        Defendants' counsels' statement that "[t]here can be no
doubt that the witnesses are giving testimony that counsel knows
to be false" stands on a different footing.  Although the exis-
tence of contradictory evidence may have given counsel a basis
for arguing that some of the witnesses were testifying falsely in
some respects, as explained above, there was no basis for a claim
that plaintiffs' counsel knew the witnesses were testifying

falsely.   In the absence of supporting evidence, such a charge is particularly inappropriate because it impugns the integrity of opposing counsel by suggesting that plaintiffs' counsel tacitly participated in conduct that violates the Federal Rules of Civil Procedure and constitutes perjury.   See 1970 Advisory Committee Note to Fed.R.Civ.P. 26(e) (An exception to the general rule that there is no "continuing burden" to supplement discovery responses "is made for the situation in which a party, or more frequently his lawyer, obtains actual knowledge that a prior response is incorrect.   This exception does not impose a duty to check the accuracy of prior responses, but it prevents knowing concealment by a party or attorney."); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93-376 (1993) ("A lawyer in a civil case who discovers that her client has lied in responding to discovery requests must take all reasonable steps to rectify the fraud, which may include disclosure to the court.").   When made without factual support, such accusations are unseemly, unfair and degrading to the profession.   See MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 73 F.3d 1253, 1262 (2d Cir. 1996) (sanctions may be warranted "where an attorney's conduct degrades the legal profession and disserves justice."); accord Perez v. Posse Comitatus, supra, 373 F.3d at 324.   In short, such allegations generate heat, but no light, by unnecessarily injecting counsel's integrity and character into the case.

Rory O. Milson, Esq., Thomas G. Rafferty, Esq. and Michael T. Reynolds, Esq., the attorneys whose names appear on the May 24 Response, are personally sanctioned in the amount of $5,000 each, said sum to be paid by each to the Clerk of the Court within ten (10) days of this Order and said sum not to be taxed to defendants' clients as a cost or expense.  In addition, since plaintiffs have prevailed on one of the three statements they challenged, Messrs. Milson, Rafferty and Reynolds are directed to reimburse plaintiffs' counsel for one-third of the reasonable attorney's fees incurred in making plaintiffs' Rule 11 motion.  Since this Order and the underlying briefs and affirmations will become part of the record in this case, no purpose would be served by striking the offending portions of the May 24 Response from the record.  I decline to direct Messrs. Milson, Rafferty and Reynolds to provide plaintiffs' counsel with written apologies; given the tone of the proceedings in this matter such apologies would not reflect actual remorse and would serve no purpose.

IV.  Conclusion

Accordingly, for all the foregoing reasons, plaintiffs' motion for sanctions is granted in part.  Rory O. Milson, Esq., Thomas G. Rafferty, Esq. and Michael T. Reynolds, Esq., the attorneys whose names appear on the Memorandum of Law containing

31

the statements that gave rise to this motion are personally sanctioned in the amount of $5,000 each, said sum to be paid by each to the Clerk of the Court within ten (10) days of this Order and said sum not to be taxed to defendants' clients as a cost or expense.  In addition, since plaintiffs' have prevailed on one of the three statements they challenged, Messrs. Milson, Rafferty and Reynolds are directed to reimburse plaintiffs' counsel for one-third of the reasonable attorney's fees incurred in making plaintiffs' Rule 11 motion.  Plaintiffs' are directed to submit evidentiary materials establishing the fees incurred in making this motion within ten (10) days of this Order; defendants shall have ten (10) days to respond.

Dated:   New York, New York
         September 29, 2006

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Jennifer M. Green, Esq.
Beth Stephens, Esq.
Maria C. LaHood, Esq.
Center for Constitutional Rights
666 Broadway
7th Floor
New York, New York  10012

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown Chomsky
Post Office Box 29726
8120 New Second Street
Elkins Park, Pennsylvania  19027

Anthony DiCaprio, Esq.
Michael Ratner, Esq.
Ratner, DiCaprio & Chomsky, LLP
80 Eighth Avenue
Suite 711
New York, New York  10011

Carey R. D'Avino, Esq.
Stephen A. Whinston, Esq.
Keino Robinson, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania  19103-6365

Rick Hertz, Esq.
EARTHRIGHTS International
1612 K Street N.W.
Suite 401
Washington, D.C.  20006

Rory O. Millson, Esq.
Thomas G. Rafferty, Esq.
Michael T. Reynolds, Esq.
Adrienne K. Wheatley, Esq.
Christopher Vergonis, Esq.
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019-7475