UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESTHER KIOBEL, *et al.*,

Plaintiffs,

– against –

ROYAL DUTCH PETROLEUM COMPANY, *et al.*,

Defendants.

02 Civ. 7618 (KMW)(HBP)

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THE SHELL
PETROLEUM DEVELOPMENT COMPANY OF NIGERIA LIMITED'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Rory O. Millson
Thomas G. Rafferty

CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for defendant The Shell Petroleum
Development Company of Nigeria Limited*

Date:  February 16, 2010

**Table of Contents**

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

Citation Conventions .......................................................................................... v

Preliminary Statement ....................................................................................... 1

Statement of Facts Regarding Personal Jurisdiction ......................................... 2

      A.     SPDC Sells All Its Crude Oil to a Third Party in Nigeria. .......................... 3

      B.     SPDC Did Not Target the United States with a Public Relations
           Campaign. ............................................................................................ 6

      C.     SPDC Did Not Direct Recruiting Efforts to the United States. ................. 6

      D.     SPDC Employees Traveled to the United States for Training or
           to Attend Trade Conferences, But Did Not Conduct Business. ................. 8

      E.     SPDC Did Not Contract for Goods or Services in the United
           States. ................................................................................................. 10

      F.     SPDC Did Not Partner on Any USAID Projects in the United
           States. ................................................................................................. 11

Argument ........................................................................................................ 13

I.     Plaintiffs Have Not Averred Facts Sufficient to Establish that SPDC Has
      Continuous and Systematic General Business Contacts with the United
      States. ....................................................................................................... 15

      A.     Plaintiffs Have Not Averred Facts to Support Their Assertion
           that SITCO Was SPDC's Agent ............................................................ 16

      B.     Plaintiffs Have Not Averred Facts to Support Continuous and
           Systematic Contact with the United States on the Basis of Their
           Additional Miscellaneous Categories of Alleged Contacts ...................... 18

           1.     SPDC Did Not Target the United States with a Public
                Relations Campaign. ................................................................... 19

           2.     SPDC Did Not Direct Recruiting Efforts to the United
                States. ...................................................................................... 19

3.   SPDC Employees Traveled to the United States for Training or to Attend Trade Conferences, But Did Not Conduct Business..........................................................................................21

4.   SPDC Did Not Contract for Goods or Services in the United States. .......................................................................................22

5.   SPDC Did Not Partner on Any USAID Projects in the United States. ...................................................................................22

II.   The Exercise of Personal Jurisdiction over SPDC in This Case Would Be Unreasonable.....................................................................................23

**Table of Authorities**

**Page(s)**

**Cases**

*Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,*
    956 F. Supp. 427 (S.D.N.Y. 1996) ........................................................................... 14

*Alkhulaqi v. Ocean Ships, Inc.,*
    No. 95 Civ. 10458(RPP), 1996 WL 403057 (S.D.N.Y. July 18, 1996) ..................... 20

*Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.,*
    1 F.3d 848 (9th Cir. 1993) .................................................................................. 24, 25

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County,*
    480 U.S. 102 (1987) ............................................................................................ 24, 25

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
    902 F.2d 194 (2d Cir. 1990) ................................................................................... 13

*Boyo v. Boyo,*
    196 S.W.3d 409 (Tex. App. 2006) .......................................................................... 11

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,*
    229 F.3d 254 (3d Cir. 2000) ............................................................................... 15, 22

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ........................................................................................... 15, 23

*Chew v. Dietrich,*
    143 F.3d 24 (2d Cir. 1998) ..................................................................................... 14

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.,*
    872 F. Supp. 81 (S.D.N.Y. 1995) ........................................................................... 14

*Frontera Res. Azerbaijan Corp. v. State Oil Co.,*
    479 F. Supp. 2d 376 (S.D.N.Y. 2007) .................................................................... 22

*Helicopteros Nacionales de Colombia v. Hall,*
    466 U.S. 408 (1984) ........................................................................................... 14, 21

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,*
    343 F. Supp. 2d 208 (S.D.N.Y. 2004) ................................................................ 20, 21

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ............................................................................................... 15

*Jazini v. Nissan Motor Co., Ltd.,*
    148 F.3d 181 (2d Cir. 1998) ....................................................................... 13, 16, 17

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 Civ. 7618, 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009)........................passim

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
   918 F.2d 1039 (2d Cir. 1990) .................................................................................. 21

*Loria & Weinhaus, Inc. v. H.R. Kaminsky & Sons, Inc.*,
   495 F. Supp. 253 (S.D.N.Y. 1980) ..................................................................... 16, 21

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ............................................................. 14, 15, 23, 24, 25

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*,
   Civ. A. No. 04-332(EGS), 2006 WL 2711527 (D.D.C. Sept. 21, 2006) ................... 16

*Porina v. Marward Shipping Co., Ltd.*,
   521 F.3d 122 (2d Cir. 2008) ............................................................................... 14, 15

*Sturm v. Boker*,
   150 U.S. 312 (1893) ................................................................................................ 18

*Stutts v. De Dietrich Group*,
   465 F. Supp. 2d 156 (E.D.N.Y. 2006) ...................................................................... 17

*The Pension Comm. of the Univ. of Montréal Pension Plan v.*
   *Banc of America Sec., LLC*,
   No. 05 Civ. 9016(SAS), 2006 WL 559811 (S.D.N.Y. Mar. 7, 2006) ........................ 21

*Ticketmaster-New York, Inc. v. Alioto*,
   26 F.3d 201 (1st Cir. 1994) ............................................................................... 23, 25

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000) ................................................................................ 17, 20

*Wiwa v. Royal Dutch Petroleum Co.*,
   No. 96 Civ. 8386, 2008 WL 591869 (S.D.N.Y. Mar. 4, 2008)..........................passim

## Statutes & Rules

Fed. R. Civ. P. 4(k)(2) ............................................................................................. 14, 16

Fed. R. Civ. P. 12(b)(2).................................................................................................. 13

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604............................ 25

## Citation Conventions

### Entities

"SPDC":  The Shell Petroleum Development Company of Nigeria Limited

"SITCO":  Shell International Trading Company

"SITASCO" or "STASCO":  Shell International Trading and Shipping Company Limited

"SIEP":  Shell International Exploration and Production, B.V.

"SPS":  Shell People Services

### Pleadings and Court Submissions

"Millson Ex.":  Exhibit to the Declaration of Rory O. Millson in Support of Defendant The Shell Petroleum Development Company of Nigeria Limited's Motion to Dismiss for Lack of Personal Jurisdiction, dated February 16, 2010

"6/29/09 D'Avino Ex.":  Corrected Declaration of Carey R. D'Avino, Esq. in Support of Plaintiffs' Motion for Reconsideration of the Court's March 4, 2008 Order Granting SPDC's Motion to Dismiss Pursuant to Rule 12(b)(2), filed June 29, 2009 (*Kiobel*, Docket No. 277)

"*Kiobel* Am. Compl.":  *Kiobel* Plaintiffs' Amended Class Action Complaint, filed May 17, 2004 (*Kiobel* Docket No. 69)

### Court Orders and Hearings

"2/3/10 Hr'g Tr.":  February 3, 2010 Hearing before Magistrate Judge Pitman

### Discovery

"[Name] Tr. __":  Deposition Transcript

"[Name] Decl.":  Declaration

"1/25/10 Pls.' Notice of Dep.":  Plaintiffs' Notice of Deposition(s) of Corporate Designee(s), dated January 25, 2010

"1/5/10 Defs.' Ans. to Interrogs. No. __":  Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories Concerning Personal Jurisdiction, dated January 5, 2010

"5/21/04 Defs.' Ans. to *Wiwa* Pls.' Second Set of Interrogs. No. __":  Defendants' Objections and Responses to *Wiwa* Plaintiffs' Second Set of Interrogatories, dated May 21, 2004

**Preliminary Statement**

On March 4, 2008, this Court, based on a careful analysis of plaintiffs'

allegations of SPDC's contacts with the United States, held that, "taken as a whole", those

allegations "fail to establish the sort of 'continuous and systematic general business contacts'

required for the assertion of general jurisdiction".  *Wiwa v. Royal Dutch Petroleum Co.*, No.

96 Civ. 8386, 2008 WL 591869, at *6 (S.D.N.Y. Mar. 4, 2008):

> "In sum, SPDC's alleged contacts with the United States, considered in the
> aggregate, are insufficient to establish the required minimum contacts for
> general jurisdiction purposes.  SPDC does not have an office, place of
> business, postal address, or telephone listing in the United States; nor is it
> licensed to do business in any state or territory of the United States.  SPDC also
> does not own any real property in the United States, or maintain any bank
> accounts in this country.  The limited contacts SPDC is alleged to have with
> the United States do not establish the sort of continuous and systematic
> presence required for the exercise of general jurisdiction".  *Id.* at *9.

On November 13, 2009, this Court granted plaintiffs' motion for

reconsideration of the dismissal of SPDC in the *Kiobel* case based on the Second Circuit's

Order in the *Wiwa v. SPDC* appeal.  *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618,

2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009).  The Court permitted "limited jurisdictional

discovery" on specific categories of plaintiffs' allegations of contacts:

- Plaintiffs alleged that "approximately 50% of SPDC's oil production
  was imported into the United States between January 1990 and June
  1996 (*i.e.*, 3.5 million barrels of crude oil each month), and Shell
  International Trading Company ('SITCO'), a separate Shell entity,
  acted as SPDC's agent in doing so".  *Id.* at *5.[1]

- Plaintiffs alleged that "SPDC targeted the U.S. with a public relations
  campaign relating to SPDC's operations in Nigeria".  *Id.*

- Plaintiffs alleged that "SPDC recruited employees in the U.S.
  through another Shell entity, Shell People Services ('SPS')".  *Id.*

---

[1] Based on an oil shipment document produced in Fall 2008, plaintiffs also alleged that
"SPDC maintained a banking relationship . . . in the United States".  *Id.* at *6 n.12.

- Plaintiffs alleged that "SPDC employees came to the U.S. for training, and to attend seminars and conferences". *Id.*[2]

- Plaintiffs alleged that "SPDC entered into contracts for services in the U.S., including the construction of a barge in New Orleans for use in Nigeria". *Id.*

- Plaintiffs alleged that "SPDC partnered on projects with, and received financial assistance from, the United States Agency for International Development ('USAID')". *Id.*

Defendants produced nearly 22,000 pages of documents, SPDC answered plaintiffs' interrogatories, and made a Rule 30(b)(6) deponent available for a full day. The discovery permitted by the Court is now complete and does not support any of plaintiffs' allegations of continuous and systematic business contacts. Thus, plaintiffs have not "aver[red] . . . facts that, if credited by the trier, would suffice to establish jurisdiction over [SPDC]". *Wiwa*, 2008 WL 591869, at *2. Rather, this discovery has confirmed the Court's findings in the March 4, 2008 Order.

### Statement of Facts Regarding Personal Jurisdiction

SPDC is a Nigerian corporation doing business in Nigeria. (Aribido Decl. ¶ 2, Millson Ex. 1.) SPDC conducts no business in the United States. (*Id.* ¶¶ 2-4.) It "does not have an office, place of business, postal address, or telephone listing in the United States; nor is it licensed to do business in any state or territory of the United States". *Wiwa*, 2008 WL 591869, at *9 (citing Aribido Decl. ¶ 7).

The jurisdictional discovery permitted by the Court in the November 13, 2009 Order demonstrates the correctness of the Court's rejection of plaintiffs' averments in the March 4, 2008 Order.

---

[2] Although not covered by the Court's Order, plaintiffs served belated requests regarding the cross-posting of employees from SPDC to companies in the United States. Subject to their objections, defendants produced documents related to this topic.

A.   **SPDC Sells All Its Crude Oil to a Third Party in Nigeria.**

"Plaintiffs do not allege that SPDC directly participated in any sales transactions with United States buyers, or that any sales of its energy products were actually conducted in the United States". *Wiwa*, 2008 WL 591869, at *4.  SPDC sold all its crude oil in Nigeria to a third party, SITCO.[3]  (Aribido Tr. 46-47, Millson Ex. 2.)  SITCO, in turn, sold the oil at its discretion to other third party buyers, and some of that ultimately reached the United States.  (*Id.* at 48-49.)  "Plaintiffs' allegations establish only that crude oil and natural gas produced by SPDC in Nigeria eventually reached the United States market through transactions conducted by certain third-party entities".  *Wiwa*, 2008 WL 591869, at *4.

Plaintiffs alleged that SITCO "acts as SPDC's agent or partner rather than an arms-length buyer" in order to impute sales to SPDC for purposes of jurisdiction.[4]  *Id.* at *7. The facts refute any claim that SITCO is SPDC's agent.  The Sale and Purchase Agreements that governed the relationship between SPDC and SITCO and the individual transactions between those entities during the relevant time period (1992 Agreement, DEF 057693-057723, Millson Ex. 3; 2000 Agreement, DEF 076047-076069, Millson Ex, 4) prove the following facts[5]:

_____

[3] Unless otherwise stated, references to SITCO throughout this brief are intended to refer to SITCO and its successor, SITASCO.

[4] In support of this allegation, plaintiffs relied on the following:  (1) A SITCO letter referred to SITCO as an "affiliate" of SPDC; (2) "SPDC expressed 'concern' for SITCO's income" during negotiations with NNPC; and (3) "SITCO was losing money in its dealings with SPDC".  *Wiwa*, 2008 WL 591869, at *7.  In their motion for reconsideration, plaintiffs cited documents that identify SPDC as the "shipper" or "consignor" of crude oil destined for the United States, and/or SITCO as the "consignee" of these shipments, which plaintiffs contended show that SPDC lent or entrusted oil to SITCO to be sold in the United States "on behalf" of SPDC.  *Kiobel*, 2009 WL 3817590, at *5.

[5] The terms of the Sale and Purchase Agreements confirm facts adduced during prior discovery.  For example, Brian Anderson testified that SPDC sold the crude to SITCO.  (Anderson Tr. 19, Millson Ex. 5.)  Similarly, Sir Philip Watts testified that "SITCO bought

3

*First*, under the Sale and Purchase Agreements, SPDC agreed to sell, and SITCO agreed to buy, all the crude oil that SPDC sought to export from Nigeria. (Agreements § 2, Millson Exs. 3, 4; *see also* Aribido Tr. 46-47, Millson Ex. 2; Anderson Tr. 19, Millson Ex. 5.)  The Sale and Purchase Agreements expressly define SPDC as the "Seller" and SITCO as the "Buyer".  (Agreements Preamble, Millson Exs. 3, 4.)

*Second*, SPDC sold its crude oil to SITCO F.O.B. *in Nigeria*.  (*Id.* § 4.) Ownership of and all risk associated with the crude oil passes to SITCO at the moment it is loaded onto the vessel of SITCO's choosing at the port *in Nigeria*.  (*Id.* §§ 3, 4; *see also* Aribido Tr. 49, Millson Ex. 2; P. Watts Tr. 189-90, Millson Ex. 6.)

*Third*, SPDC plays no part in determining to whom SITCO sells the crude oil or the locations to which SITCO ships the crude oil.  (Aribido Tr. 48-49, 59, Millson Ex. 2; Aribido Decl. ¶ 4, Millson Ex. 1.)

*Fourth*, the price of the oil sold pursuant to the Sale and Purchase Agreements is calculated on a monthly basis by reference, in part, to the prices for the relevant grade of crude oil quoted in *Platt's Oilgram Price Report*.  (Agreements § 5 & Appendix 1, Millson Exs. 3, 4; Aribido Tr. 54, 59, 62, Millson Ex. 2.)  The price received by SPDC is in no way contingent upon or based upon any subsequent sale of the oil by SITCO and is fixed in advance regardless of the region in which SITCO ultimately sells the oil.  (Agreements § 5 & Appendix 1, Millson Exs. 3, 4; Aribido Tr. 71-72, Millson Ex. 2.)  Indeed, Appendix 1 states that "for the purpose of calculating Realisable Price", the crude oil that is sold under the agreement will be "deemed delivered" to the three regions specified in the Appendix at specific percentages.  (Agreements at Appendix 1 § 3, Millson Exs. 3, 4.)  In other words, the

---

the crude and, when it left, they were the owners" and "of course, they [SITCO] would sell it to whoever".  (P. Watts Tr. 189-90, Millson Ex. 6.)

price paid does not fluctuate based on where final delivery is made.  (Aribido Tr. 62, Millson Ex. 2.)  SPDC's interest in the oil ends once it delivers the oil at the port in Nigeria.  (*Id.*)

*Fifth*, any dispute over the Sale and Purchase Agreements' requirements regarding certification of the quantity, quality and origin of the crude oil must be made by SITCO to SPDC within 45 days of the Bill of Lading, *i.e.*, the date of delivery in Nigeria.  (Agreements § 11.3, Millson Exs. 3, 4.)

Thus, the Sale and Purchase Agreements are arms-length contracts for sale. Plaintiffs' reliance on terms like "consignor" and "consignee" found in the form bills of lading and certain other miscellaneous shipping documents (*e.g.*, Aribido Ex. 7, DEF 077111-077112, Millson Ex. 7; Aribido Ex. 8, DEF 077635-077647, Millson Ex. 8; Aribido Ex. 9, DEF 077390-077407, Millson Ex. 9), is misplaced.  The terms "consignor" and "consignee" are terms of art in the shipping context that mean nothing more than "seller" and "buyer", respectively.  (*See* Aribido Tr. 93, 94, Millson Ex. 2.)  The use of these terms in individual shipping documents is thus consistent with the terms of the Sale and Purchase Agreements.[6]

---

[6] Plaintiffs asserted in their motion for reconsideration, based on a single document (6/29/09 D'Avino Ex. 6), that "SPDC maintained a banking relationship with Morgan Stanley in the United States".  *Kiobel*, 2009 WL 3817590, at *6 n.12.  The Court stated that "[a]lthough Plaintiffs' characterization appears to overstate the case, Plaintiffs are entitled to discovery concerning SPDC's banking contacts".  *Id.*  In response to interrogatories and document requests regarding banking contacts with the United States, SPDC produced a declaration of an SPDC employee, Jonathan Anolu, in which he provided the following facts: (1) "SPDC does not have any bank accounts in the United States" (Anolu Decl. ¶ 2, Millson Ex. 27);  (2) "SPDC does not have any brokerage accounts in the United States and does not own any stock in United States companies" (*id.* ¶ 3); and (3) "SPDC does not have any contacts with United States banks or United States investment banks" (*id.* ¶ 4).  Plaintiffs did not include this category in its list of topics for the Rule 30(b)(6) deposition.  (*See* 1/25/10 Pls.' Notice of Dep. at Schedule A, Millson Ex. 10.)

**B.   SPDC Did Not Target the United States with a Public Relations Campaign.**

Plaintiffs alleged previously that SPDC has conducted a "long running public relations campaign aimed at the United States", in particular relating to the Ogoni crisis.[7] *Wiwa*, 2008 WL 591869, at *5.  The jurisdictional discovery ordered by the Court has not adduced any facts to support plaintiffs' allegations.  Indeed, plaintiffs did not include this topic in their list of topics for the Rule 30(b)(6) deposition.  (*See* 1/25/10 Pls.' Notice of Dep. at Schedule A, Millson Ex. 10.)

**C.   SPDC Did Not Direct Recruiting Efforts to the United States.**

Plaintiffs alleged previously that "Shell People Services ('SPS'), a purported 'sister company' of SPDC based in Houston, TX, engaged in recruiting activities in the United States on behalf of SPDC" and that SPS "operated as an agent for SPDC and other arms of the Shell group".  *Wiwa*, 2008 WL 591869, at *5.

During jurisdictional discovery, defendants produced SPS recruiting documents, which demonstrate that plaintiffs are wrong.

*First*, SPDC itself performed the majority of its recruiting in Nigeria.  (Aribido Tr. 191, Millson Ex. 2.)

*Second*, SPS is a third-party global service company based in Europe, not in the United States.  (Aribido Tr. 149, 204-05, 212, Millson Ex. 2.)  Each operating company submitted annual global recruitment targets for hires that it would allocate to SPS Global.  (*Id.* at 190, 204, Millson Ex. 2; DEF 082600-082609, Millson Ex. 11.)  These targets were not tied to any specific region but rather were broken down by the category of qualification of the recruits.  (*See, e.g.*, DEF 082600-082609, Millson Ex. 11.)  Whether the recruits were

---

[7] Plaintiffs also alleged that SPDC's alleged public relations strategy is "ongoing", but as the Court recognized, plaintiffs "allege[d] no facts to support this assertion".  *Wiwa*, 2008 WL 591869, at *5 n.7.

referred from Europe or the United States or any other region was not a concern to SPDC. (Aribido Tr. 204-06, Millson Ex. 2.)

   *Third*, the targets SPDC allocated to SPS were low in comparison to many other companies and in 2004, SPDC's targets for SPS were zero.  (*See, e.g.*, DEF 082600-082609 at 082603, Millson Ex. 11; DEF 086112-086114, Millson Ex. 12.)  Moreover, not all targets were reached, especially for SPDC.  For example, SPS did not meet any of the targets for the third and fourth quarters of 2000 and the first and second quarters of 2001. (DEF 081382-081384, Millson Ex. 13.)

   *Fourth*, once the targets were submitted to SPS, SPS would source those targets to its various branches, including the United States SPS branch, at SPS's discretion.  (Aribido Tr. 204-05, 212, Millson Ex. 2.)  Certain individuals in the Houston office were assigned within SPS to handle applicants who were Nigerian nationals studying in the United States. (DEF 082600-082609, Millson Ex. 11.)  Likewise, individuals in the Europe office handled applicants who were Nigerian nationals studying in Europe.  (*Id.*)  Indeed, in 2002 and 2003, all of SPDC's total targets were assigned to SPS in Europe.  (*See* DEF 083349-083350 ("SPS has allocated the Shell Nigeria graduate targets to be sourced solely from Europe".), Millson Ex. 14; DEF 084790-084795 at 084793 (SPS assigning all four of SPDC's 2003 targets to SPS-Europe), Millson Ex. 15.)

   *Fifth*, SPDC had the discretion as to whether to offer employment to any candidate:  "Every offer will be extended by the home OU [operating company such as SPDC]".  (DEF 086780-086795 at 086786, Millson Ex. 16.)  Moreover, SPS charged a fee for each individual candidate hired by SPDC with SPS's assistance.  (Aribido Tr. 220, Millson Ex. 2; *see also, e.g.*, DEF 082629, Millson Ex. 17; DEF 084790-084795 at 084794, Millson Ex. 15 (setting forth fee structure for SPS services).)  When applicants were interested in applying, they were instructed to apply online, and SPS performed screening interviews and assessments

7

of candidates.  (Aribido Tr. 195-97, Millson Ex. 2.)  If the individual candidate was qualified,

the individual's application was forwarded to SPDC for SPDC's human resources department

to review and determine whether to make an offer.  (*Id.*; *see also* DEF 082003, Millson Ex. 18.)

**D.**   **SPDC Employees Traveled to the United States for Training or to Attend Trade Conferences, But Did Not Conduct Business.**

SPDC employees took miscellaneous trips to the United States in order to

participate in various training opportunities or to attend various trade or industrial conferences.[8]

(*See* 1/5/10 Defs.' Ans. to Pls.' Interrogs. No. 1 & Appendix A, Millson Ex. 19.)  For example,

several employees attended the Offshore Technology Conference in Houston.  (*See  id.* (Alli,

M.; Inyang, S.; Weekse, A.; Yusuf, M.).)  Others attended events for the Society of Petroleum

Engineers.  (*See id.* (Aguh, R.; Amoo, O.; Orunta, I.).)  Other employees attended annual

seminars and exhibitions of the American Society for Industrial Security.  (*See id.* (Achu, M.;

Ebiri, C.).)  Some employees attended training courses at third party training facilities, whereas

others attended training courses offered by Shell Oil.  (Aribido Tr. 123-24, Millson Ex. 2.)

Others received training with respect to how to operate barges and rigs that were being

constructed by or for third-party contractors or subcontractors in the United States for ultimate

delivery to SPDC in Nigeria pursuant to local contracts, which ultimately would be operated by

local SPDC staff.  (*Id.* at 121-22, 135; *see* 1/5/10 Defs.' Ans. to Interrogs. No. 1 at Appendix A,

Millson Ex. 19 (Aghedo, A.; Iyamu, P.; Oke, G.; Okpechi, G.).)

---

[8] SPDC's answer to Interrogatory No. 1 stated that "[d]efendants can identify a list of SPDC employees who planned travel to the United States, but cannot confirm that each individual in fact traveled to the United States" and that as a result, "the list is over-inclusive and likely includes persons who did not in fact travel".  Appendix A is thus a list of SPDC employees who intended to travel to the United States, the window of time in which they intended to travel and for what purpose.  For purposes of this motion, SPDC agreed to stipulate that these employees did in fact travel for the purpose listed in Appendix A.  (2/3/10 Hr'g Tr. 3-4, Millson Ex. 20.)  The dates indicated in Appendix A, however, are not precise dates of travel but rather windows of time in which the employee requested travel.  (Aribido Tr. 125, 136-37, Millson Ex. 2.)

None of the trips in Appendix A or otherwise was to conduct any business in the United States on behalf of SPDC.  Plaintiffs have not averred any facts to the contrary.

During jurisdictional discovery, plaintiffs for the first time asserted that cross-posting of SPDC employees at Shell Oil in the United States supported jurisdiction over SPDC.  Defendants objected on the ground that cross-posting is irrelevant to jurisdiction because, as plaintiffs have long been aware, when an SPDC employee accepts a cross-posting position, his or her employment with SPDC terminates and he or she begins employment with the host company.  Nevertheless, subject to their objections, defendants produced one or both of the following documents for SPDC employees who went on cross-posting during the time period 2000 to 2004:  (1) a "handshake" agreement, which is a form with sections to be completed by the host company (in the United States), the employee, and the parent/base company (SPDC) (*see, e.g.*, Aribido Ex. 10, DEF 097639-097644, Millson Ex. 24); and (2) a more formal employment letter from the host company to the employee and signed by both (*see, e.g.*, Aribido Ex. 11, DEF 097645-097651, Millson Ex. 25).

These documents confirm what various witnesses have already testified, that when an employee is cross-posted, his or her employment with SPDC terminates and he or she begins employment with the host company in the United States.[9]  For example, the handshake agreement provides that the host company "hereby offers [the employee] a position on the following terms and conditions" and provides a "First Day Payroll" date at the host and a "Last Day Payroll" date at SPDC.  (Aribido Ex. 10, DEF 097639-097644, Millson Ex. 24.)  Similarly, the employment letter contains various terms that make clear that

---

[9] Many witnesses, including current and former SPDC employees, testified about cross-posting at their depositions, and defendants previously answered an interrogatory on this subject as well.  (*See, e.g.*, Anderson Tr. 15-16, Millson Ex. 5; Jennings Tr. 136-37, Millson Ex. 21; Detheridge Tr. 10-11, Millson Ex. 22; *see also* 5/21/04 Defs.' Ans. to *Wiwa* Pls.' Second Set of Interrogs. No. 22, Millson Ex. 23.)

a change in employment takes place when an employee is cross-posted.  The letter provides, on behalf of SIEP in Europe, that the host company in the United States "wishes to offer [the employee] employment, effective from [his or her] date of departure, taking account of travel time".  (Aribido Ex. 11, DEF 097645-097651 at 097645, Millson Ex. 25.)  Thus, the employee's travel to the United States is paid by the host company, not SPDC, and the employee is not an SPDC employee when he or she travels to the United States.[10]

### E.    SPDC Did Not Contract for Goods or Services in the United States.

Plaintiffs alleged previously that SPDC contracted with U.S.-based companies.  There are no facts to support that allegation.  To the contrary, SPDC did *not*:

- obtain any services in the United States, either directly or through any agent, from any United States Party (1/5/10 Defs.' Ans. to Interrogs. Nos. 4, 7, Millson Ex. 19; Aribido Tr. 108, 110, Millson Ex. 2);

- purchase any goods in the United States, either directly or through any agent, from any United States Party (1/5/10 Defs.' Ans. to Interrogs. No. 5, Millson Ex. 19; Aribido Tr. 108, 110, Millson Ex. 2); or

- purchase or lease any equipment in the United States, either directly or through any agent, from any United States Party (1/5/10 Defs.' Ans. to Interrogs. No. 6, Millson Ex. 19; Aribido Tr. 108, 110, Millson Ex. 2).

SPDC did not have any contractors that were United States Parties.  (1/5/10 Defs.' Ans. to Interrogs. No. 11, Millson Ex. 19.)  Rather, SPDC contracted with local Nigerian companies.  (*See* Aribido Tr. 135, Millson Ex. 2.)  For example,

- Brown & Root Energy Services, the Halliburton entity with which plaintiffs asserted that SPDC entered into contracts operates in "Nigeria through Halliburton West Africa Limited in association

---

[10] The remainder of the letter details the terms and conditions of the employee's employment at the host company.  Although the letter states that the employee "will receive a letter from [SPDC] concerning the position that applies when [the employee's] employment with Shell Oil Company is concluded" (Aribido Ex. 11 at DEF 097646, Millson Ex. 25), there is no formal obligation or tie between SPDC and the employee once he or she is cross-posted.  Indeed, if there is no position available at SPDC for the employee at the end of the cross-posting, he or she will not be hired.  (Aribido Tr. 156-57, Millson Ex. 2.)

with Halliburton's Nigerian entity, Halliburton Energy Services Nigeria Limited".  (2000 Press Releases:  Halliburton Business Unit Wins $300 Million Shell Contract (Apr. 17, 2000), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=67605&p=irol-newsArticle&ID=544990 (last visited Feb. 15, 2010).)

- Baker Hughes, with which plaintiffs alleged SPDC contracted for the construction of a barge to be used in connection with oil exploration in Nigeria, operates in Nigeria through Baker Hughes Nigeria Limited; SPDC did not contract with Baker Hughes in the United States.  (*See* Aribido Tr. 135, Millson Ex. 2.)

- ABNL Limited, with which SPDC contracted, is a Nigerian limited liability company.  *See Boyo v. Boyo*, 196 S.W.3d 409, 413 (Tex. App. 2006).

Whether any of the local Nigerian companies with which SPDC contracted in turn subcontracted with any United States Party or procured materials from the United States was the contractor's business, not SPDC's.  (*See* 1/5/10 Defs.' Ans. to Interrogs. No. 11, Millson Ex. 19; Aribido Tr. 135, Millson Ex. 2.)

Plaintiffs did not include this category in its list of topics for the Rule 30(b)(6) deposition.  (*See* 1/25/10 Pls.' Notice of Dep. at Schedule A, Millson Ex. 10.)

### F. SPDC Did Not Partner on Any USAID Projects in the United States.

Plaintiffs alleged previously that "SPDC has 'participat[ed] extensively in projects receiving significant financial assistance' from the United States Agency for International Development ('USAID')".  *Wiwa*, 2008 WL 591869, at *5.  As the Court noted, "Plaintiffs specify only two such projects in their submissions, the 'West African Gap Pipeline (WAGP) Project' and (2) the 'Cassava Enterprise Development Project,' both of which were principally based in Africa".  *Id.*  The Court stated that "Plaintiffs do not allege that any of these projects have any connection to the United States".  *Id.* at *9. There is none.

11

SPDC did not receive any grant from the United States Government for any SPDC community development program.  (1/5/10 Defs.' Ans. to Interrogs. No. 12, Millson Ex. 19.)  SPDC did not partner on any projects with USAID in the United States but rather with USAID's *Nigeria* branch *in Nigeria*.  Defendants produced a Memorandum of Understanding between SPDC and "United States Agency for International Development (USAID) / Nigeria".  (MOU, DEF 097427-097432, Millson Ex. 26.)  The "Parties" are defined as SPDC and USAID/Nigeria, and the USAID/Nigeria office is listed in Nigeria.  (*Id.* at DEF 097428, 097431-32.)  No United States entity is a party to the MOU.[11]  The MOU states that "USAID's assistance activities *in Nigeria* are carried out primarily through USAID's bilateral assistance mission *in Nigeria* (hereinafter 'USAID/Nigeria')".  (*Id.* at DEF 097427 (emphasis added).)  The purpose of the MOU was to "promot[e] democracy, stability and economic prosperity *in Nigeria*".[12]  (*Id.* at DEF 097428 (emphasis added).)  Nothing in the MOU creates any relationship between SPDC and the United States.

The MOU served as the platform for funding community development projects *in Nigeria*.  For example, with respect to the Cassava Enterprise Development Project ("CEDP"), the information provided on CEDP's website makes clear that CEDP is a project by the Integrated Cassava Project (ICP), which is "funded by the Federal Government of Nigeria, the Niger Delta Development Commission, Shell Petroleum Development Company of Nigeria, United States Agency for International Development [USAID], and States in southern Nigeria".  (Integrated Cassava Project, http://www.cassavabiz.org (last

---

[11] A USAID/Washington signature block was included below the signature block for USAID/Nigeria, but USAID/Washington is not a party to the MOU.

[12] The MOU expressly states that it is "not an obligation of funds, nor does it constitute a legally binding commitment by either Party".  (MOU at DEF 097428, Millson Ex. 26.)

visited Feb. 15, 2010).)  In other words, SPDC contributed to CEDP *in Nigeria*, along with other *Nigerian* entities, *Nigerian* government bodies and USAID/*Nigeria*.[13]

Plaintiffs did not include this category in its list of topics for the Rule 30(b)(6) deposition.  (*See* 1/25/10 Pls.' Notice of Dep. at Schedule A, Millson Ex. 10.)

### Argument

"On a Rule 12(b)(2) motion to dismiss, plaintiff bears the burden of establishing jurisdiction over defendant".  *Wiwa*, 2008 WL 591869, at *2.  In the November 13, 2009 Order, the Court held that on this motion, the Court would "not address whether Plaintiffs' allegations satisfy the 'pre-discovery' standard for a Rule 12(b)(2) motion"; rather, the Court would "consider the jurisdictional question after jurisdictional discovery has been completed".  *Kiobel*, 2009 WL 3817590, at *6 n.11.  Thus, the standard here is not simply whether plaintiffs "'ma[de] a prima facie showing of jurisdiction'".  *Wiwa*, 2008 WL 591869, at *2 (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998)).  Rather, plaintiffs must "'include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant'".  *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).[14]

---

[13] USAID/Nigeria's website states that "The Cassava Enterprise Development Project (CEDP) is a $11.7 million, five year partnership between USAID/Nigeria, the Shell Petroleum Development Corporation, Bayelsa State Government and the International Institute of Tropical Agriculture".  (USAID Nigeria, http://www.usaid.gov/ng/ cassavaproject.htm (last visited Feb. 15. 2010).)

[14] Although plaintiffs bear the burden to aver facts to support exercising jurisdiction over SPDC, they have not put forward any such facts.  Thus, this motion demonstrates how the jurisdictional discovery ordered by the Court in the November 13, 2009 Order has confirmed the Court's original findings in the March 4, 2008 Order as to each of the categories of plaintiffs' alleged contacts that plaintiffs "fail[ed] to establish a prima facie case of sufficient minimum contacts".  *Wiwa*, 2008 WL 591869, at *10.

Plaintiffs concede that they cannot show sufficient contacts on the part of SPDC with New York and that they must proceed pursuant to Federal Rule of Civil Procedure 4(k)(2).[15] *Wiwa*, 2008 WL 591869, at *3.  Because "[t]he first two requirements of Rule 4(k)(2) are uncontested for the purposes of this motion . . . the dispositive issue is whether Plaintiffs have made a prima facie showing that the exercise of jurisdiction over SPDC would be consistent with the standards of due process".  *Id.* (citing *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998); *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 87 (S.D.N.Y. 1995)).

A two-step analysis applies to determine whether plaintiffs can satisfy due process under Rule 4(k)(2).  *First*, the court must determine whether the defendant has minimum contacts.  In general jurisdiction cases such as this,[16] plaintiffs must show that SPDC "has 'continuous and systematic general business contacts' with the United States".  *Id.* at *4 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984)); *see also Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 128 (2d Cir. 2008); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).[17]  As the Court noted, "[t]he 'continuous and systematic' standard for general jurisdiction is 'stringent' and requires plaintiff to prove that defendant's contacts 'approximate physical presence' in the

---

[15] "To establish personal jurisdiction over a defendant pursuant to Rule 4(k)(2), plaintiff must show that (1) plaintiff's cause of action arises under federal law, (2) defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State, and (3) the exercise of personal jurisdiction over defendant is consistent with the standards of due process".  *Id.* (citing Fed. R. Civ. P. 4(k)(2); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 434 (S.D.N.Y. 1996)).

[16] This Court held that "[s]pecific jurisdiction does not exist in this case because Plaintiffs' causes of action arise out of SPDC's alleged conduct in Nigeria, and not its contacts with the United States".  *Wiwa*, 2008 WL 591869, at *4.  The Court held that "[p]laintiffs must therefore rely on the Court's general jurisdiction".  *Id.*

[17] For purposes of Rule 4(k)(2), the relevant forum is the United States.  *See Porina*, 521 F.3d at 126-27.

United States". *Wiwa*, 2008 WL 591869, at *4 (citations omitted). If plaintiffs cannot show continuous and systematic general business contacts with the United States, the inquiry ends. *See Porina*, 521 F.3d at 129.

        *Second*, if continuous and systematic general business contacts can be shown, the assertion of personal jurisdiction over the defendant must comport with "'traditional notions of fair play and substantial justice'"—*i.e.*, is "reasonable under the circumstances of the particular case". *See Metro. Life*, 84 F.3d at 568 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

        Here, plaintiffs fail both prongs of the personal jurisdiction analysis. Plaintiffs have not averred facts that establish that SPDC had "continuous and systematic general business contacts" with the United States. (*See infra* Part I.) Even if plaintiffs had shown such contacts, the assertion of personal jurisdiction would be unreasonable under the circumstances of this case. (*See infra* Part II.)

## I.    PLAINTIFFS HAVE NOT AVERRED FACTS SUFFICIENT TO ESTABLISH THAT SPDC HAS CONTINUOUS AND SYSTEMATIC GENERAL BUSINESS CONTACTS WITH THE UNITED STATES.

        SPDC had no continuous and systematic general business contacts with the United States such that SPDC "purposefully avail[ed] itself of the privilege of conducting activities within the forum". *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotation omitted). The contacts on which plaintiffs rely are "random", fortuitous" or "attenuated" and thus cannot support the exercise of general jurisdiction over SPDC. *E.g.*, *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000). *First*, SPDC did not sell any oil in the United States and plaintiffs have not averred facts to support their assertion that SITCO was SPDC's agent in order to impute SITCO's sales of oil to SPDC. (*See infra* Part I.A.) *Second*, plaintiffs have not averred facts to show continuous and

systematic general business contacts with the United States with respect to any of their additional miscellaneous categories of allegations. (*See infra* Part I.B.)

### A.   Plaintiffs Have Not Averred Facts to Support Their Assertion that SITCO Was SPDC's Agent.

SPDC did not sell any crude oil in the United States or to any United States entity. Indeed, all its crude oil was sold to SITCO in Nigeria. SITCO, in turn, sold the oil to various customers, including in the United States. (*See supra* 3-5.) It is well-established that sales of a product in the United States through a third party are insufficient to establish personal jurisdiction. *See Oceanic Exploration Co. v. ConocoPhillips, Inc.*, Civ. A. No. 04-332(EGS), 2006 WL 2711527, at *13-14 (D.D.C. Sept. 21, 2006) (under Rule 4(k)(2), allegation that oil from foreign defendants' oil production activities in the Timor Sea is sold to the United States is insufficient to exercise general jurisdiction over defendants with little or no connection to the United States); *see also Jazini*, 148 F.3d at 184 (foreign car manufacturer is not "present" in New York simply by virtue of the fact that it sells cars through a New York distributor); *Loria & Weinhaus, Inc. v. H.R. Kaminsky & Sons, Inc.*, 495 F. Supp. 253, 257 (S.D.N.Y. 1980) ("The mere shipment of goods into New York does not constitute 'doing business'".). Thus, this Court found that "the fact that a substantial quantity of 'crude oil and natural gas produced by SPDC *in Nigeria* [was] eventually sold on the United States market by third-party entities *other than SPDC*' did not establish the sort of 'systematic' and 'continuous' business contacts with the United States necessary to exercise general jurisdiction over SPDC".[18] *Kiobel*, 2009 WL 3817590, at *5.

---

[18] The sale of natural gas is irrelevant. As this Court noted, "Plaintiffs admit that such energy products were exported to the United States by Nigeria Liquified Natural Gas ('NLNG'), a 'separate entity'" from SPDC. *Wiwa*, 2008 WL 591869, at *4 n.6.

In order to avoid the consequences of this black letter law, plaintiffs seek to impute SITCO's sales of oil in the United States to SPDC by alleging that SITCO acted as SPDC's agent in making those sales.  (*See supra* 3-5.)  "An agency relationship exists between a foreign corporation and an affiliate where the affiliate 'renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available'".  *Wiwa*, 2008 WL 591869, at *7 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000)).  The Court found that "Plaintiffs failed to allege sufficient facts to establish an 'agency' relationship between SPDC and SITCO, such that SITCO's contacts with the forum could be imputed to SPDC for jurisdictional purposes".  *Kiobel*, 2009 WL 3817590, at *5.  The Court stated that "the only 'service' Plaintiffs allege SITCO performed 'on behalf of' SPDC in the United States is the 'sale of substantial amounts of crude oil'".  *Wiwa*, 2008 WL 591869, at *7.  Plaintiffs' allegations were "insufficient to establish the sort of interdependence necessary to prove the existence of an agency relationship between [SPDC and SITCO]".  *Id.* (citing *Stutts v. De Dietrich Group*, 465 F. Supp. 2d 156, 162-63, 166 (E.D.N.Y. 2006) (no agency relationship despite allegations that the affiliate exclusively sold defendant's products in the forum); *Jazini*, 148 F.3d at 184).

In the November 13, 2009 Order, the Court stated that it "continues to believe that the facts alleged by Plaintiffs appear insufficient for a court to attribute SITCO's sales of oil to SPDC for jurisdictional purposes" and that "[t]here is substantial evidence in the record to support Defendant's contention that SITCO acted merely as a distributor of SPDC-produced oil in the United States", but granted discovery.  *Kiobel*, 2009 WL 3817590, at *6.

Jurisdictional discovery has confirmed that SITCO did not act as SPDC's agent in selling oil in the United States.  The Sale and Purchase Agreements that governed the relationship between SPDC and SITCO throughout the relevant time period demonstrate

17

unequivocally that SPDC was the seller and SITCO was the buyer of SPDC's crude oil, and that title to the oil transferred the moment that the oil was loaded onto the ship.  In other words, SPDC ceased to be the owner and ceased to have any title or risk to the oil at the loading dock in Nigeria.  Oil was not shipped outside of Nigeria "on behalf of" SPDC.[19]  Indeed, wherever the oil eventually ended up had nothing to do with SPDC, and the price received by SPDC was not contingent in any way on where oil actually wound up.  (*See supra* 3-5.)[20]

### B.  Plaintiffs Have Not Averred Facts to Support Continuous and Systematic Contact with the United States on the Basis of Their Additional Miscellaneous Categories of Alleged Contacts.

In the March 4, 2008 Order, the Court found that "SPDC's other alleged contacts with . . . the United States are far too 'sporadic and occasional' to tip the balance in favor of exercising general jurisdiction".  *Wiwa*, 2008 WL 591869, at *6.

No facts adduced during the jurisdictional discovery support plaintiffs' allegations as to the other five miscellaneous categories of alleged contacts.  To the contrary, jurisdictional discovery has confirmed the Court's original findings in the March 4, 2008 Order.  Indeed, plaintiffs did not even pursue three of the five remaining categories at the Rule 30(b)(6) deposition they conducted, namely their allegations regarding public relations activity (*see supra* 6), contracts for goods and services (*see supra* 11), and the partnership with USAID (*see supra* 13).

---

[19] The terms "consignor" and "consignee" in miscellaneous shipping documents are terms of art in the shipping context that mean nothing more than "seller" and "buyer", respectively.  (*See supra* 5.)  Their use in shipping documents is consistent with the relationship of Buyer and Seller in the Sale and Purchase Agreements.  In any event, "[a] printed billhead can have little or no influence in changing the clear and explicit language of the letters, and it in no way controls, modifies, or alters the terms of the contract".  *Sturm v. Boker*, 150 U.S. 312, 326-27 (1893).

[20] In their motion for reconsideration, plaintiffs alleged that SPDC had a banking relationship with the United States based on a shipping document.  In the November 13, 2009 Order, the Court stated that "[p]laintiffs' characterization appears to overstate the case" but permitted discovery.  *Kiobel*, 2009 WL 3817590, at *6 n.12.  SPDC does not have any bank accounts or brokerage accounts in the United States and does not have any contacts with U.S. banks or U.S. investment banks.  (*See supra* 5 n.6.)

1.      **SPDC Did Not Target the United States with a Public Relations Campaign.**

In the March 4, 2008 Order, the Court held that "SPDC's alleged public relations activities in the United States were far too limited in scope to support a finding of general jurisdiction". *Wiwa*, 2008 WL 591869, at *7. The types of contacts alleged by plaintiffs, such as cultivating relationships with NGOs, improving the quality of media knowledge regarding SPDC's operations in Nigeria, and briefing development agencies associated with intergovernmental organizations, were "limited and sporadic", *id.* at *8, and there was no evidence that the bulk of the activity even occurred in the United States, *id.* Thus, the Court held that plaintiffs' allegations were "insufficient to support a finding that SPDC maintained a continuous and systematic present in the United States". *Id.*

No facts adduced in jurisdictional discovery support plaintiffs' allegation. (*See supra* 6.)

2.      **SPDC Did Not Direct Recruiting Efforts to the United States.**

In the March 4, 2008 Order, the Court held that "although Plaintiffs label SPS an 'agent' of SPDC, they allege no facts detailing the purported agency relationship between the two entities" and stated it would "not credit such conclusory allegations on a motion to dismiss". *Id.* at *8. As discussed above, an agency relationship exists where the affiliate "renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available". *Id.* at *7. Plaintiffs have not averred facts sufficient to demonstrate an agency relationship between SPDC and SPS.

*First*, one of the hallmarks of an agency relationship is whether the purported agent has the power to bind the principal, and plaintiffs have not asserted, and there is no basis

for any such assertions, that SPS could bind SPDC in recruiting matters.  *See, e.g.*, *Alkhulaqi v. Ocean Ships, Inc.*, No. 95 Civ. 10458(RPP), 1996 WL 403057, at *2 (S.D.N.Y. July 18, 1996) (defendant not "doing business" in forum through third-party recruiter because recruiter lacked the ability to make binding employment decisions).  To the contrary, SPDC made all the hiring decisions.  (*See supra* 7-8.)

> *Second*, "[t]he agent must be primarily employed by [the principal] and not engaged in similar services for other clients".  *Wiwa*, 226 F.3d at 95.  Here, as the documents make clear, SPS was engaged in global recruiting for operating companies around the world. Indeed, the recruiting targets allocated to SPS for SPDC were minor in comparison to other companies.  (*See supra* 6-7.)

> *Third*, plaintiffs have not shown that the purported recruiting services are "sufficiently important" to SPDC, such that SPDC "itself would perform equivalent services if" SPS were not available.  *Wiwa*, 226 F.3d at 95.  To the contrary, SPDC did most of its recruiting in Nigeria.  Only a fraction of its targets was sourced to SPS Global, a smaller fraction was assigned by SPS Global to the United States—indeed, in 2002 and 2003, all the targets were sourced to Europe—and a smaller fraction still ultimately was offered employment by SPDC.  (*See supra* 6-7.)

> The documents produced in jurisdictional discovery, much like the exhibits plaintiffs submitted in their original opposition to SPDC's motion to dismiss merely demonstrate that applicants interested in working for any of the operating companies around the world can apply online at shell.com and that SPS performed a paid service to act as a clearing house for those applications.  (*See supra*  6-8.)  This does not amount to "continuous and systematic" general business contacts with the United States necessary to confer general jurisdiction over a Nigerian corporation.  *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 343 F. Supp. 2d 208, 215-16 (S.D.N.Y. 2004) (New York company website

20

accessible by Texas residents permitting users to search nationwide employment database and submit resumes and cover letters electronically insufficient to confer general jurisdiction); *see also The Pension Comm. of the Univ. of Montréal Pension Plan v. Banc of America Sec., LLC*, No. 05 Civ. 9016(SAS), 2006 WL 559811, at *5 (S.D.N.Y. Mar. 7, 2006) (recruitment materials for organization as a whole rather than the specific entity over which jurisdiction was sought insufficient to confer general jurisdiction over that entity).

### 3.    SPDC Employees Traveled to the United States for Training or to Attend Trade Conferences, But Did Not Conduct Business.

In the March 4, 2008 Order, the Court found that plaintiffs' allegations of only a "few isolated visits do not amount to the sort of continuous and systematic contact with the forum sufficient to exercise general jurisdiction".  *Wiwa*, 2008 WL 591869, at *8.

Travel by SPDC employees to the United States for training or to attend trade conferences is insufficient to establish jurisdiction over SPDC.  Indeed, such activity is precisely what the Court in *Helicopteros* found to be insufficient to constitute doing business.  *See* 466 U.S. at 416-19 (contract negotiation session; purchase of helicopters, equipment and training services; and sending personnel for training to facilities in forum do not constitute continuous and systematic general business contacts); *see also Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1045-46 (2d Cir. 1990) (thirteen employee business trips, which were of short duration, made by different employees, and which "occurred sporadically over a period of eighteen months" insufficient to establish a systematic and continuous presence in the forum).  Further, attendance at trade shows is not the conduct of SPDC business.  Even if it were, "[o]ccasional visits by [a defendant] to [forum] trade shows . . . are not sufficient contacts to support jurisdiction".  *Loria & Weinhaus*, 495 F. Supp. at 257; *see Helicopteros*, 466 U.S. at 418.

All the travel here was sporadic and was for training purposes or for trade conferences.  No employee travel was to conduct SPDC business.  (*See supra* 8-9.)

During jurisdictional discovery, plaintiffs alleged that the cross-posting of employees from SPDC to Shell Oil in the United States supports jurisdiction.  Discovery has confirmed that this category is irrelevant to jurisdiction.  Documents and testimony establish that when an employee is cross-posted, his or her employment with SPDC terminates and he or she begins employment with the host company in the United States.  Indeed, the position at the host company becomes effective before the employee even travels to the United States and thus, is no longer an SPDC employee when he or she boards the plane to leave Nigeria.  (*See supra* 9-10.)

### 4.   SPDC Did Not Contract for Goods or Services in the United States.

In the March 4, 2008 Order, the Court found that "the fact that SPDC contracted with four U.S.-based companies . . . to assist in certain crude oil and natural gas projects outside the United States does not establish 'continuous and systematic general business contacts' with the United States".  *Wiwa*, 2008 WL 591869, at *9 (citing *Frontera Res. Azerbaijan Corp. v. State Oil Co.*, 479 F. Supp. 2d 376, 387 (S.D.N.Y. 2007) (holding that a foreign corporate defendant's production-sharing contracts with several American oil companies "does not demonstrate a continuous and systematic presence in the United States")).

No facts adduced in discovery change this result.  To the contrary, discovery has shown that SPDC does *not* contract with United States companies but rather contracts with local companies who may, at their discretion, subcontract or procure materials in the United States.  (*See supra* 10-11.)

### 5.   SPDC Did Not Partner on Any USAID Projects in the United States.

In the March 4, 2008 Order, the Court found that participation in development projects with USAID was "irrelevant to the jurisdictional analysis, because Plaintiffs do not allege that any of these projects have any connection to the United States".  *Wiwa*, 2008 WL 591869, at *9 (citing *BP Chems.*, 229 F.3d at 261).

The facts adduced in discovery or otherwise publicly available demonstrate that SPDC did not receive any funding from USAID and that SPDC provided funding to certain projects *in Nigeria* to which USAID/Nigeria also contributed its own funding. Plaintiffs have not put forward any evidence that any of SPDC's involvement in these projects took place in the United States, or that SPDC has had any contacts, let alone continuous and systematic contacts, with the United States as a result of its participation in projects in Africa in which USAID also participated.[21]   (*See supra* 11-13.)   Participation in a charitable endeavor in Nigeria in which the Nigerian affiliate of a U.S.-based entity also participates cannot be a basis for subjecting SPDC to general jurisdiction.

## II.     THE EXERCISE OF PERSONAL JURISDICTION OVER SPDC IN THIS CASE WOULD BE UNREASONABLE.

Even if plaintiffs could show—which they cannot—that SPDC had continuous and systematic contacts, the "exercise of personal jurisdiction would be decidedly unreasonable".[22]  *Metro. Life*, 84 F.3d at 575.  The five factors for determining "reasonableness" under *Metropolitan Life* weigh in favor of dismissal.

*First*, the burden on SPDC to litigate in this forum is great because it is a Nigerian company with no forum contacts.  SPDC operates only in Nigeria, has no physical

---

[21] As Congress has recognized in the context of Foreign Sovereign Immunities Act jurisdiction and a foreign state's contacts with the United States: "[A] foreign state's mere participation in a foreign assistance program administered by the Agency for International Development . . . would not itself constitute a commercial activity" and "a foreign state's activities in and 'contacts' with the United States resulting from or necessitated by participation in such a program would not in themselves constitute a sufficient commercial nexus with the United States so as to give rise to jurisdiction".  H.R. Rep. No. 94-1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615.

[22] The "reasonableness" component asks whether, despite a showing of minimum contacts, "some other considerations would render jurisdiction unreasonable".  *Burger King*, 471 U.S. at 477.  "[T]he weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction".  *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) (cited with approval in *Metro. Life*, 84 F.3d at 569).

presence in or connections with this forum, and has not previously litigated in this forum. Accordingly, this factor, which is accorded significant weight in this analysis, weighs in favor of dismissal.  *See Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 114 (1987).

       *Second*, the forum has no particular interest in the dispute.  This case will not confer any benefit upon forum citizens as a whole.  The Supreme Court has recognized that where the litigation has little, if any, practical import to the citizens of the forum, this factor weighs in favor of dismissal.  *See id.* at 114-15.

       *Third*, in evaluating how the plaintiff's interest in obtaining relief was furthered by its choice of forum, the Second Circuit has focused on whether the plaintiff was a *citizen* and whether "any witnesses or other evidence [was] more convenient to [the] forum".  *Metro. Life*, 84 F.3d at 574.  Here, none of the plaintiffs is alleged to be a citizen of the United States,[23] whereas the convenience of the witnesses plainly does not favor the United States.

       *Fourth*, the interstate judicial system's interest in obtaining the most efficient resolution of a controversy weighs in favor of dismissal.  "In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located".  *Id.*  Indeed, "[t]he site where the injury occurred and where the evidence is located usually will be the most efficient forum".  *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 852 (9th Cir. 1993).  Plaintiffs have identified no one with personal knowledge of the material allegations in the complaint, let alone anyone with such knowledge in the United States.

       *Fifth*, in considering the advancement of substantive policies, courts must "consider the procedural and substantive policies of other *nations* whose interests are

---

    [23] All of the *Kiobel* plaintiffs *reside* in, but are not citizens of, the United States.  They are citizens of Nigeria.  (*See Kiobel* Am. Compl. ¶¶ 6-17.)

affected by the assertion of jurisdiction" in the forum. *Asahi*, 480 U.S. at 115.  Moreover, when "the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction".  *Amoco Egypt Oil*, 1 F.3d at 852 (holding "international context" of dispute between two foreign corporations relating to an accident in Egyptian waters "militates" in favor of dismissal).  Indeed, the Nigerian Government has previously stated that this litigation could place "under strain the cordial relations that exist with the Government of the United States of America".  (*See* Nigerian Gov't Ltr., Millson Ex. 28.)

The exercise of personal jurisdiction over SPDC on this record would be unreasonable.  *See Metro. Life*, 84 F.3d at 575.  "The weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction".  *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994).  Here, a finding of general jurisdiction would subject SPDC to the burden of litigating in a forum in which it does no business and has no presence.

February 16, 2010

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by _____

Rory O. Millson
Thomas G. Rafferty

825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rmillson@cravath.com
trafferty@cravath.com

*Attorneys for defendant The Shell Petroleum Development Company of Nigeria Limited*

25