UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            |
ESTHER KIOBEL, et al.                                       |
                                                            |
                          Plaintiffs,                       |
                                                            |          02 Civ. 7618 (KMW) (HBP)
             -against-                                      |
                                                            |          OPINION AND ORDER
ROYAL DUTCH PETROLEUM                                       |
COMPANY, et al.,                                            |
                                                            |
                          Defendants.                       |
                                                            |
------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

        This is a putative class action brought under the Alien Tort Statute ("ATS") against

various Royal Dutch/Shell ("Shell") entities involving allegations of human rights abuses in

Nigeria in the 1990s related to the Defendants' oil and development activities in the region.

Defendant The Shell Petroleum Development Company of Nigeria ("SPDC"), a Shell Nigerian

subsidiary, renews its motion to dismiss for lack of personal jurisdiction.

        On November 16, 2009, the Court (1) granted Plaintiffs' motion for reconsideration of

the Court's March 4, 2008 Order, dismissing SPDC as a defendant for lack of personal

jurisdiction, and (2) ordered further jurisdictional discovery.[1]  Kiobel v. Royal Dutch Petroleum

Company, No. 02-Civ.-7618, 2009 WL 3817590 (S.D.N.Y. Nov. 16, 2009).  That discovery is

now complete.[2]  For the reasons discussed below, the Court GRANTS SPDC's renewed motion

---

[1] On June 3, 2009, the Court of Appeals for the Second Circuit issued a Summary Order vacating this
Court's March 4, 2008 Order, dismissing SPDC as defendant for lack of personal jurisdiction.  The appeal
was brought by plaintiffs in a related action ("Wiwa Plaintiffs") where SPDC was also named as a
defendant.  Wiwa v. Shell Development Corp., No. 08 Civ. 1803, 2009 WL 1560197 (2d Cir.
June 3, 2009).

[2] Plaintiffs also appeal from Magistrate Judge Pitman's April 16, 2010 order, denying Plaintiffs' request
to compel SPDC to produce certain additional documents related to "cross-posting" of SPDC employees

to dismiss.  (Dkt. No. 320.)  Plaintiffs have failed to assert jurisdictional facts sufficient to establish "continuous and systematic general business contacts" with the United States as required for the assertion of general jurisdiction over SPDC.  Fed. R. Civ. P. 4(k)(2); see Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).

BACKGROUND

The facts and procedural history of this case are set forth in the Court's prior orders, familiarity with which is assumed.  They are summarized here to the extent they are relevant.

Plaintiffs in this and the related actions in Wiwa[3] are a group of individuals who, along with their decedents, protested SPDC's oil exploration and development activities in the Ogoni region of southern Nigeria.  Plaintiffs allege, inter alia, that these protests were suppressed, with violence, by agents of the Nigerian government, with the corporation and the assistance of SPDC and SPDC's corporate parents, formerly known as Royal Dutch Petroleum Company and Shell Transport and Trading Company (collectively, "Royal Dutch Shell").

I. Procedural History

Plaintiffs filed this putative class action on September 30, 2002 (the "Kiobel action").  Discovery and other pre-trial proceedings in this action have been largely coordinated with the prior related Wiwa actions.[4]

---

in the United States.  As set forth below, the Court finds that Magistrate Judge Pittman's decision was neither clearly erroneous nor contrary to law, and affirms the April 16, 2010 discovery order.

[3] The related actions, Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386 ( "Wiwa I" ); Wiwa v. Brian Anderson, No. 01 Civ.1909 ( "Wiwa II" ); and Wiwa v. Shell Petroleum Development Corp., No. 04 Civ. 2665 ( "Wiwa III" ), settled on June 8, 2009.

[4] In the Wiwa actions, Plaintiffs named Royal Dutch Petroleum Company and Shell Transport and Trading Company defendants in Wiwa I, and named Brian Anderson, a senior SPDC executive, as a defendant in a separate action, Wiwa II.  When the Kiobel Plaintiffs brought this action, they named both Royal Dutch/Shell and Brian Anderson as defendants in a single action.

On April 6, 2004, Wiwa Plaintiffs commenced a separate action against SPDC ("Wiwa III"), and on May 17, 2004, Kiobel Plaintiffs added SPDC as a defendant in this action.  In November 2004, Defendant SPDC filed, in both actions, a motion to dismiss for lack of personal jurisdiction and a motion to preclude any further jurisdictional discovery.[5]

In its March 8, 2008 Order, the Court granted SPDC's motion.  The Court found that Plaintiffs failed "to establish a prima facie case of sufficient minimum contacts" with the forum — here the United States — for the Court to exercise jurisdiction over SPDC.  Kiobel, 2008 WL 591869 at *10.  The Court also found that Plaintiffs' jurisdictional allegations were "too vague and conclusory" to warrant further jurisdictional discovery.  Id.  In making these findings, the Court relied on the fact that Plaintiffs "[had] access to the extensive discovery taken in connection with the prior related actions, including discovery from SPDC."  Id. at *2.

On April 16, 2008, the Wiwa III Plaintiffs appealed the Court's March 4, 2008 Order.  The March 4, 2008 Order was a final ruling in Wiwa III (because it dismissed the sole defendant), but the Order dismissing SPDC from the Kiobel Amended Complaint was not a final ruling, and, therefore, was not ripe for appeal.

On June 3, 2009, the Second Circuit vacated this Court's March 4, 2008 Order.  The Second Circuit concluded that it was "clear error" for this Court (1) to find that "discovery conducted in the related actions encompassed the issue of personal jurisdiction over SPDC,"[6] 2009 WL 1560197 at *2, and (2) to have required Plaintiffs to include an averment of facts to support its prima facie case of jurisdiction — the standard courts apply when the motion is

---

[5] On September 6, 2007, this Court withdrew the reference to Magistrate Judge Pitman with respect to the motion to dismiss.

[6] On appeal, Wiwa III Plaintiffs argued that discovery in the related actions was focused on SPDC's conduct in Nigeria, and its relationship to Royal Dutch/Shell, and not on personal jurisdiction in the United States over SPDC.

brought <u>after</u> discovery has been conducted.  In a motion to supplement the record on appeal, Plaintiffs also submitted several documents that Plaintiffs obtained in discovery in the related cases <u>after</u> the Court's decision on SPDC's motion — documents that that Plaintiffs argued on appeal supported their jurisdictional allegations.

On remand, in Wiwa III, this Court was instructed to consider the relevance of the documents at issue, and to decide:

> [W]hether continuing discovery in the related cases has now been sufficient [1] for [plaintiffs] to adequately allege personal jurisdiction over SPDC, [2] to show that [plaintiffs] are sufficiently unlikely to be able to establish jurisdiction, so as to justify dismissal once more or [3] to allow further jurisdictional discovery.

Id. at *3.  On June 8, 2009, the three Wiwa actions settled.

On June 24, 2009, Kiobel Plaintiffs moved for reconsideration of the Court's March 8, 2008 Order, which dismissed SPDC as a defendant from the Kiobel Amended Complaint.  On November 16, 2009, this Court granted Plaintiffs' motion for reconsideration.  The Court concluded that the "Second Circuit's June 3, 2009 Summary Order, which vacated the Court's March 4, 2008 Order . . . [was] a 'change in controlling law' that warrant[ed] reconsideration of the Court's (same) March 4, 2008 Order dismissing the Kiobel claims against SPDC."  2009 WL 3817590, at *2.  The Court stated that:

> The Second Circuit found that this Court committed clear error in finding that the prior related discovery <u>included</u> the relevant jurisdiction discovery with respect to SPDC. As a result, this Court applied the wrong standard on SPDC's motion to dismiss for lack of personal jurisdiction. The Court is also persuaded that this error impacted the Court's decision to preclude any further jurisdictional discovery. That decision assumed that it was unlikely Plaintiffs could, given the prior related discovery, uncover additional facts necessary to sustain jurisdiction. <u>See</u> <u>Kiobel</u>, 2008 WL 591869 at *10 (noting the "extensive discovery against all Defendants, including SPDC, in these and their related cases over the past ten years").

On reconsideration, the Court granted Plaintiffs' request to conduct further jurisdictional discovery.  The Court ordered discovery with respect to certain categories of alleged business contacts between SPDC and the United States.  These categories were related to Plaintiffs' allegations that:  (1) a substantial quantity of SPDC-produced crude oil was imported into the United States by Shell International Trading Company ("SITCO"), a separate Shell entity, and that SITCO acted as SPDC's agent in doing so; (2) SPDC targeted the U.S. with a public relations campaign relating to SPDC's operations in Nigeria; (3) SPDC recruited employees in the U.S. through another Shell entity, Shell People Services ("SPS"); (4) SPDC employees came to the U.S. for training, and to attend seminars and conferences; (5) SPDC entered into contracts for services in the U.S. and received financial assistance from, the United States Agency for International Development ("USAID").[7]  2009 WL 3817590 at *5.  The Court stated that: "[o]nce discovery has been completed, the Court will be in a position to consider, with the benefit of a more complete evidentiary record, any renewed motion to dismiss filed by SPDC for lack of personal jurisdiction."  Id. at 3.

In a memo endorsed letter, dated December 2, 2009, this Court referred all discovery disputes to Magistrate Judge Pitman.  Discovery related to personal jurisdiction over SPDC

---

[7] In its November 16, 2009 Order, the Court stated, with respect to SPDC's oil shipments, that "[t]he Court continues to believe that the facts alleged by Plaintiffs appear insufficient for a Court to attribute SITCO's sales of oil to SPDC for jurisdictional purposes."  The Court stated that there is "substantial evidence in the record to support Defendants' contention that SITCO acted merely as a distributor of SPDC-produced oil in the United States."  The Court, however, granted Plaintiffs' request for further jurisdictional discovery, finding that Plaintiffs "had made at least a 'threshold showing' of a jurisdictional basis over SPDC with respect to the sale of SPDC oil in the United States, and SPDC's relationship with SITCO."  Id. at *6.  With respect to SPDC's other alleged contacts with the United States, the Court stated that it was "required to assess the defendant's contacts with the forum as a whole," and that, although it was a "close question," "further development [of the record] with respect to these . . . contacts during the period 2000-2004 was appropriate [the period for which Plaintiffs requested jurisdictional discovery]."  Id. at *6-7.

concluded on February 8, 2010.  On February 16, 2010, SPDC renewed its motion to dismiss for lack of personal jurisdiction.

II.  Facts Relevant to Personal Jurisdiction

      In their opposition to SPDC's renewed motion to dismiss, Plaintiffs contend that personal jurisdiction over SPDC is appropriate based on the following jurisdictional contacts:  (1) shipments of SPDC-produced oil to the United States, and SPDC's contractual relationship with SITCO; (2) "cross-posting" of SPDC employees in the United States, and visits by other SPDC employees to the United States; and (3) recruitment efforts by SPS in the United States on behalf of SPDC.[8]  The Court credits Plaintiffs' factual averments as true, and construes all pleadings and affidavits in the light most favorable to Plaintiffs.[9]  See, e.g., PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).[10]

      A.  Sales of SPDC-produced crude oil in the United States

---

[8] With respect to the other categories of contacts for which Plaintiffs sought (and the Court ordered) further jurisdictional discovery, supra, Plaintiffs have submitted no new facts in support of these allegations.  Plaintiffs did not notice any of these categories as topics for its Rule 30(b)(6) deposition.

[9] "A Rule 12(b)(2) motion is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . [and therefore] all pertinent documentation submitted by the parties may be considered in deciding [the] motion.  John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co., Ltd., No. 91-Civ-3644, 1992 WL 26765, at *6 n.1 (S.D.N.Y. Feb. 5, 1992).  The Court is also authorized to consider affidavits and exhibits in support of the motion (submitted by SPDC), so long as the Court resolves any factual disputes in favor of the non-moving party (in favor of Plaintiffs).  See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993).

[10] The Court also granted Plaintiffs' request for jurisdictional discovery on Plaintiffs' allegation that SPDC may have maintained a banking relationship in the United States.  Id. at *6 n.12.  In their opposition to the instant motion, Plaintiffs submit no facts in support of this allegation, and did not include this category in its list of topics for the Rule 30(b)(6) deposition.  In response to interrogatories and document requests, SPDC produced a declaration of an SPDC employee, Mr. Jonathan Anolu, stating that:  (1) SPDC does not have any bank accounts in the United States; (2) SPDC does not have any brokerage accounts in the United States and does not own any stock in United States companies; and (3) SPDC does not have any contacts with United States banks or United States investment banks.  (Millson Ex. 27.)

According to Plaintiffs, SPDC — the Nigerian operating subsidiary of the Shell Group of Companies — is the largest private-sector oil and gas company in Nigeria.  SPDC is the operator of a joint venture agreement between the state-owned Nigerian National Petroleum Company ("NNPC"), SPDC, Elf Petroleum Nigeria Limited, and Nigerian Agip Oil Company.  The interests in the joint venture break down as follows:  NNPC (varied between 55% and 60%); Shell/SPDC (30%); Elf Petroleum Nigeria Limited (varied between 10% and 5%); and Nigerian Agip Oil Company (5%).

Plaintiffs allege that, from 1996 through 2004, 220 million barrels of SPDC-produced oil were shipped to the United States (valued at approximately $8.3 billion).  SPDC's company profile states that the United States is one of SPDC's "main customers"  (the others are China, Canada, South Africa, and the UAE).  (D'Avino Ex. 11.)  A "Memorandum of Understanding" entered into between SPDC and the Government of Nigeria also states that the United States is intended to be one of the primary markets for SPDC-produced crude oil.  (MOU ¶ 2.5, Appx. A; D'Avino Ex. 9.)

SPDC did not sell to, or participate in any transactions with, United States buyers. Kiobel, 2008 WL 591869, at *4.  Rather, SPDC sold all of its crude oil to Shell International Trading Company ("SITCO").  SITCO, in turn, sold the oil around the world to third-party buyers.  (See Arbido Tr. 46-47; Millson Ex. 2; see also P. Watts Tr. 189-90, Millson Ex. 6 (testifying that "SITCO bought the crude and, when it left, they were the owners" and "of course, they [SITCO] would sell it to whoever")).  Plaintiffs have alleged that about of half of SPDC's oil production reached the United States market via SITCO.

During the relevant period, the transactions between SPDC and SITCO were governed by two "Sale and Purchase Agreements":  the 1992 Agreement (Millson Ex. 3) and the 2000

Agreement (Millson Ex. 4).  Pursuant to the Sale and Purchase Agreements,[11] SPDC (the "Seller") agreed to sell and deliver, and SITCO (the "Buyer") agreed to purchase: "all the Crude Oil which [SPDC] may require from time to time to be exported from Nigeria."  (Agreements § 2.)  SPDC sold its crude oil to SITCO "free on board" (F.O.B.) in Nigeria.  Ownership of, and all risk associated with, the crude oil passed to SITCO at the point the oil was loaded onto a vessel (of SITCO's choosing) at port in Nigeria.  (Agreements §§ 3, 4.)  SPDC appears to play no part in determining to whom SITCO sells the crude oil, or the locations to which SITCO ships the crude oil.

The price of the oil sold under the Agreements (1) was calculated on a monthly basis by reference to the prices for the relevant grades of crude oil quoted in Platt's Oilgram Price Report (published by McGraw Hill), and (2) was weighted using certain markets as reference points to calculate the adjusted or "realizable price" ("RP") of the oil.  Oil sold under the Agreements was "deemed delivered" in specific percentages to three regions:  60% was deemed delivered to the United States; 20% was deemed delivered to North West Europe; and 20% was deemed delivered to the Mediterranean.  (Agreements Appx. 1 § 3.)  In this way, the price paid by SITCO did not depend on the location of the oil's final delivery; the price was set in advance, based upon the assumption that 60% of oil would reach the United States market.  The RP formula also appears to contain cost adjustments that take into account "processing fees," "refinery yields," and "freight" charges for each of the identified regions, including the United States.  (Agreements Appx. 1 §§ 4, 7, 8.)  Plaintiffs cite an internal memorandum suggesting that the inclusion of refinery yields in the RP formula may reflect "the old argument of Nigeria's entitlement to participate in high refiners' margins."  (See A002333; D'Avino Ex. 21.)

---

[11] The parties have not identified any relevant difference between the 1992 Agreement and the 2000 Agreement for purposes of the motion.

Finally, Plaintiffs note that the bills of lading and certificates of origin used in "every SPDC/SITCO" transaction identify SPDC as the "shipper" and SITCO as the "consignee."[12] (See D'Avino Ex. 34; Millson Exs. 7-9.)  The bills of lading also contained a "New Jason Clause," a "Both to Blame Clause," and a "USA Clause Paramount" that would apply in the event that liability for an accident or collision is decided "in accordance with the law and practice of the United States of America."

B.  "Cross-posting" of SPDC employees and SPDC employee visits to the United States

Plaintiffs allege that at least 48 SPDC employees were "cross-posted" to Shell affiliates in the United States during the years 2000-2004.[13]  These assignments usually lasted for a period of three to four years.[14]  When an employee is "cross-posted", his "formal"[15] employment with SPDC terminates, and he becomes an employee of the host company.[16]

---

[12] Section 9.3 of the Agreements state that "All Vessels nominated for lifting by [SITCO] shall conform to the regulations and standards in force for the port in question" and that "[SPDC ] shall be responsible for keeping [SITCO] aware of such regulations and standards."  The parties dispute whether "the port in question" in the Agreements refers only to the port of departure (which would be limited to ports in Nigeria) or to both the port of departure and the port of arrival (which would include ports in the United States).  SPDC's reading — that the port in question refers to the Nigerian port of departure — better fits both the text of the provision and the structure of the sales agreement.  However, on a motion to dismiss, the Court must resolve all ambiguities in Plaintiffs favor, and therefore, the Court will assume that SPDC's obligation to keep SITCO informed of regulations and standards could include regulations and standards in place at ports in the United States.

[13] The years 2000-2004 is the period for which Plaintiffs requested jurisdictional discovery.  See Kiobel, 2009 WL 3817590, at *6, 7 (noting that "[t]he period most relevant to an assessment of SPDC's contacts with the United States . . . would include the years immediately prior to 2004, when Plaintiffs filed the Amended Complaint adding SPDC as a defendant").

[14]     Plaintiffs appeal from Magistrate Judge Pitman's April 16, 2010 Order, denying Plaintiffs' request to compel SPDC to produce documents concerning SPDC employees who commenced "cross-posting" assignments in the United States prior to 2000, but who remained "cross-posted" to a position within the United States between 2000-2004.  Magistrate Judge Pitman stated that the "defendants' production did probably exclude some employees who were "cross-posted" to the United States within the jurisdictionally relevant period," but concluded that the documents sought by Plaintiffs would not "materially add to the jurisdictional facts currently before the court." 2010 WL 1558152 (S.D.N.Y. Apr. 16, 2010).

        Magistrate Judge Pitman's April 16, 2010 Order was neither clearly erroneous nor contrary to law, and therefore, the Court AFFIRMS the discovery order.  See 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ.

Plaintiffs allege that "cross-posting" "was part of a systematic program through which SPDC sent staff to the United States (and other locations), for training and temporary assignment" in order to increase the "technical and managerial competence of Nigerian nationals." (Pls. Mem. at 12.)    SPDC's Rule 30(b)(6) deponent testified as follows:

> Whenever there are opportunities for people who have the right potential to go far in the organization, we send them out to have first-hand experience [sic] of these projects, and it doesn't have to be the U.S. alone. . . . We send them to Malaysia, Singapore, the Middle East.  They go everywhere.  It's all about developing local competence, and that's why today 95 percent, more than 95 percent of staff in Nigeria are Nigerians. . . . [I]n the management of say SPDC or SNEPCO, for example, there are just very few expatriates who are in management positions. They are virtually all Nigerians.  So this is the result of this kind of exposures and opportunities that are provided to people to learn how these things are done hands-on.

(Aribido Dep. 116:8-117:10; D'Avino Ex. 14.)[17]

Plaintiffs point to certain employment-related documents that were sent to SPDC "cross-posted" employees, which Plaintiffs contend show a continuing relationship between the

---

P. 72(a).  Magistrate Judge Pitman was correct that the documents sought by Plaintiffs were not sufficiently probative to warrant re-opening discovery.  Plaintiffs allege that approximately 12 SPDC employees commenced "cross-posting" assignments in the United States each year during the 2000-2004 period and remained in the United States for approximately four years. For purposes of this motion, the Court will assume the same rate of commencement (and length of stay) for the 1996-2000 period, which means that about 50 SPDC employees would be on "cross-posting" assignments in the United States (in a sample year) during the 2000-2004 period (i.e. the jurisdictionally relevant period).  Having the names, titles, and job descriptions for each of these employees, in addition to the names, titles, and job descriptions of the 48 employees SPDC identified for 2000-2004 period, would not alter the Court's jurisdictional analysis.

[15] The employment-related perquisites that survived "formal" termination of employment with SPDC are set forth, underline infra.

[16] Plaintiffs used nearly 7 full pages of its oversized brief to list the names, positions, and duration of assignment for each of the 48 "cross-posted" employees that were identified by SPDC in discovery.  (Pls. Mem. 17-24.)

[17] There is factual support for Plaintiffs' contention that SPDC's program of overseas assignment was intended, in part, to promote the development of SPDC Nigerian staff and the increasing "Nigerianisation" of SPDC's workforce.  (See DEF 000369, D'Avino Ex. 40; DEF 006017-19, D'Avino Ex. 38).

employee and SPDC.  One of these documents was an employment letter from Shell International Exploration and Production B.V. ("SEIP"), a Netherlands company and Shell's global headquarters for worldwide operations.  The letter states, <u>inter alia</u>, that (1) Shell Oil Company (the well-known U.S. operator) or one of its subsidiaries "wishes to offer you employment, effective from your departure, taking account of travel"; (2) the employee's "base country" would remain Nigeria (in order to establish a baseline for certain items such as remuneration, pension, and leave arrangements if and when the employee returns to Nigeria); (3) that the employee will remain a member of the Shell Nigeria pension fund (for purposes of contributions); and that (4) SPDC will "remain your home company responsible for your career." The letter also stated that "You will receive a letter from your home company [SPDC] concerning the position that applies when your employment with Shell Oil Company is concluded."[18]

The letter was transmitted to the "cross-posted" employee along with an "Open Resourcing Handshake" agreement, a form with sections to be completed by the host company (in the United States), the employee, and the parent/base company (SPDC).  The handshake agreement identifies the host company; the job and title of the position in the United States; the "last day payroll" at SPDC and "first day payroll" at the host company; and a departure window (approximately when the employee's assignment at the host company would terminate);

Plaintiffs also note that various other SPDC employees traveled to the United Sates for training, to attend seminars and various trade and industrial conferences, and for other purposes. SPDC produced a chart (Appendix A) listing some 145 individuals who planned to travel to the

---

[18] According to SPDC's Rule 30(b)(6) deponent, SPDC is under no formal or legal obligation to re-hire the employee once he completes the "cross-posting" assignment; if no position is available at SPDC, he will not be hired.  (Aribido Tr. 156-57, Millson Ex. 2.)

United Sates, when they planned to travel, and for what purpose.[19]  (D'Avino Ex. 91.)  SPDC

required its employees to demonstrate a "business driven learning need" to justify attendance at

overseas events.  (Aribido Dep. 116:18-117:10; D'Avino Ex. 14.)  SPDC's Personnel Polices

and Procedures Manuel for the year 2000 also stated that:  "[F]rom time to time a team

comprising of one or more SPDC staff might be required to work overseas, possibly in offices of

a contractor for the purpose of supervising project design, gaining hands-on experience, etc."

(D'Avino Ex. 115.)  Plaintiffs also identify several SPDC employees who appeared to receive

training in the United States with respect to the operation of barges and rigs that were being

constructed by third-party contractors or subcontractors (for ultimate delivery to SPDC in

Nigeria), as well as SPDC employees who appeared to be involved in supervising certain aspects

of the construction and/or testing of this equipment in the United States.  (See Pls. Mem. at 24-

27; Millson Ex. 19.)

     C.  Recruitment efforts in the United States

     Plaintiffs allege that another Shell entity, Shell People Services ("SPS"), attempted to

recruit employees in the United States to work for SPDC in Nigeria.  The facts adduced in

jurisdictional discovery demonstrate the following regarding SPDC's recruitment of employees

in the United States.

     SPDC performed a majority of its recruiting itself in Nigeria.  (Aribido Tr. 191, Millson

Ex. 2.)  SPDC used the services of SPS to attempt to recruit a small number of employees from

---

[19] SPDC's answer to Plaintiffs' Interrogatory No. 1 stated that: "[d]efendants can identify a list of SPDC employees who planned to travel to the United States, but cannot confirm that each individual in fact traveled to the United States," and therefore, "the list is over-inclusive and likely includes person who did not in fact travel."  For purposes of this motion, SPDC agreed to stipulate that these employees did travel and did so for the purposes listed in the Appendix.  SPDC did not agree to stipulate, however, that these employees were in the United States during the time-periods listed in the Appendix A; according to SPDC, these were not precise dates of travel but were rather windows of time in which the employee requested that travel take place.

the United States and Europe.  In 2002, 2003, and 2004, it appears that SPS recruited no

employees for SPDC from the United States.[20]

      For recruiting that was conducted through SPS, the process generally worked as follows.

Every year, each operating Shell company, such as SPDC, would submit to SPS (a global

services company based in Europe) a list of the number and type of employees it hoped to recruit

for open positions at the company.  (See Millson Ex. 11.)  After the operating company

submitted this list to SPS, SPS would assign responsibility for filling the position to its various

branch offices, including SPS's United States office located in Houston, Texas ("SPS Houston").

      The SPS branch office was responsible for performing screening interviews and

assessments of individual candidates.  Applicants who demonstrated potential to fill a vacancy at

SPDC were forwarded to SPDC's human resources department to review and to determine

whether to make an offer.  SPDC maintained discretion as to whether to offer employment to any

candidate:  "Every offer will be extended by the OU [operating company such as SPDC]."  (DEF

086786 Millson Ex. 16.)  SPS charged the operating company a fee for each candidate ultimately

hired with SPS's assistance, which ranged from $8,000 to $12,000 for each employee hired.

(D'Avino Ex. 110.)

DISCUSSION

      The factors that typically support the exercise of general jurisdiction over a corporate

defendant are not present in this case.  SPDC is a foreign corporation organized under the laws of

Nigeria, with its corporate headquarters in Lagos, Nigeria.   SPDC does not have "an office,

place of business, postal address, or telephone listing in the United States" and it is not "licensed

to do business in any state or territory in the United States."  See Kiobel, 2008 WL 591869, at

---

[20] In 2002 and 2003, SPS recruited from Europe for SPDC positions.  In 2004, SPDC did not seek SPS's assistance
to fill any positions.

*9.   Plaintiffs contend that personal jurisdiction over SPDC is nevertheless appropriate because: (1) shipments of SPDC-produced oil were made to the United States; (2) SPDC employees were "cross-posted" to, and otherwise visited, the United States; and  (3) SPDC used SPS to attempt to recruit United States residents to work for SPDC in Nigeria.  As set forth below, these contacts, taken as whole, are not sufficient to establish the sort of "continuous and systemic general business contacts with the United States" required for the assertion of general jurisdiction over SPDC.

I.  <u>Legal Standards</u>

To establish personal jurisdiction over a defendant pursuant to Federal Rule of Civil Procedure 4(k)(2), a plaintiff must show that (1) the plaintiff's cause of action arises under federal law, (2) the defendant is not subject to the jurisdiction of any one state, and (3) the exercise of personal jurisdiction over the defendant is consistent with the requirements of due process.  <u>Porina v. Marward Shipping Co., Ltd.</u>, 521 F.3d 122, 127 (2d Cir. 2008); Daventree <u>Limited v. Republic of Azerbaijan</u>, 349 F.Supp.2d 736, 760 (S.D.N.Y. 2004) ("Rule 4(k)(2) is designed to fill a gap in the enforcement of federal law . . . over defendants having sufficient contacts with the United States [as a whole] . . . but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." (citing Fed. R. Civ. P. 4(k)(2), adv. comm. note (1993)).  The parties do not dispute that the first two elements of the Rule 4(k)(2) inquiry are satisfied in this case.  Accordingly, the existence of personal jurisdiction over SPDC will turn on whether the exercise of personal jurisdiction is consistent with the requirements of due process.

The due process inquiry for personal jurisdiction has two related components:  the "minimum contacts" test and the "reasonableness" test.  Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).

First, a court must determine whether the defendant has sufficient minimum contacts with the forum to justify the exercise of personal jurisdiction.  Porina, 521 F.3d at 127.  Where, as here, a plaintiff relies on the court's general jurisdiction, it must demonstrate that the defendant has maintained "continuous and systematic general business contacts" with the United States.  Metropolitan Life, 84 F.3d at 568-69 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984)); see also id. (explaining that a determination that a court can assert general jurisdiction over a defendant demands the application of a "more stringent minimum contacts test" than that applicable to specific jurisdiction).   The "continuous and systematic" standard requires a plaintiff to prove that the defendant's contacts "approximate physical presence" in the United States.  In re Ski Train Fire in Kaprun, Austria, 257 F. Supp. 2d 717, 730 (S.D.N.Y. 2003).  Courts must assess a defendant's contacts with the forum "as a whole" to determine whether exercising personal jurisdiction over the defendant would satisfy the requirements of due process,  Metropolitan Life, 84 F.3d at 570; the relevant time period for this inquiry is "a period that is reasonable under the circumstances — up to and including the date the suit was filed,"  id. at 568-69; Daventree, 349 F. Supp. 2d at 765.

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant.  Metropolitan Life, 84 F.3d at 566.  A plaintiff's burden, however, "varies with the procedural posture of the case."  Daventree, 349 F. Supp. 2d at 757.  Prior to discovery, a plaintiff can defeat a Rule 12(b)(2) motion to dismiss by pleading "good faith, legally sufficient allegations of jurisdiction, i.e., by

making a prima facie showing of jurisdiction." Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998) (internal quotations marks and citations omitted).   Where, as here, jurisdictional discovery has been conducted, a plaintiff's prima facie showing must be "factually supported"; that is, it must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant."[21]   Metropolitan Life, 84 F.3d at 567 (quoting Ball v. Metallurgie Hoboken Overpelt, S.A., 902 F. 2d 194, 197 (2d Cir. 1990)).

Second, if a plaintiff is able to demonstrate the requisite minimum contacts, the Court must determine whether the assertion of jurisdiction comports with "traditional notions of fair play and substantial justice," i.e., whether it is "reasonable under the circumstances" of the particular case. Metropolitan Life, 84 F.3d at 568.  If a plaintiff fails to satisfy the minimum contacts test, the due process inquiry ends, and the Court need not proceed with the reasonableness analysis.  Id.

---

[21] Plaintiffs suggest, in a footnote of their brief (Pls. Mem. at 31 n.125), that a plaintiff's prima facie showing must be factually supported only where there has been "extensive" jurisdictional discovery, and that the "limited" discovery conducted in this case did not satisfy that requirement.  Plaintiffs are wrong on both the law and the facts.  In support of the legal contention, Plaintiffs appear to rely on the Second Circuit's decision in Metropolitan Life.  In that case, the Second Circuit stated that "[in] the instant case . . . the parties have conducted extensive discovery regarding the defendant's contacts with the forum state," 84 F.3d at 567 (emphasis added), and determined that Met Life would be required to include an averment of facts in support of its jurisdictional allegations (i.e. that the post-discovery standard would apply), id.  As authority for that conclusion, the court cited its earlier decision in Ball, 902 F. 2d 194, 197 (2d Cir. 1990), which set forth the pre- and post-discovery standards applicable to jurisdictional testing motions and which did not include any additional requirement that the discovery conducted be "extensive."  In any event, the court rejects Plaintiffs' (underlying) contention that discovery in this case has been deficient and that it would be unfair to hold them to Ball's post-discovery standard.  In its November 16, 2009 Order, the Court granted Plaintiffs' request for jurisdictional discovery on each of the categories of contacts identified by Plaintiffs in its motion for reconsideration.  In the Order, the Court also noted that this discovery would supplement the "extensive discovery [that has been conducted] in this and the related actions spanning more than a decade."  2009 WL 3817590, at *7.  The Court finds that the factual record is sufficiently well-developed and that it is appropriate to apply Ball's post-discovery standard in this case.

At the motion to dismiss stage, the Court credits all Plaintiffs' factual averments as true, resolving any doubts in Plaintiffs' favor.[22]  See A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993).

II.  Application

A.  Oil Shipments

The facts submitted by Plaintiffs regarding the shipment of SPDC-produced oil to the United States are insufficient to establish jurisdiction over SPDC.

SPDC does not sell any crude oil in the United States and does not sell it to any customers in the United States.  Pursuant to the Sale and Purchase Agreements, SPDC (the Seller) sells all of its crude oil to SITCO (the Buyer) F.O.B. in Nigeria, such that ownership of, and all risk associated with, the oil passes to SITCO at the point of loading in Nigeria.  SITCO in turn sells the oil to customers around the world, including to customers in the United States. SPDC appears to play no role in determining to whom SITCO sells the oil, or the location to which SITCO ships the oil.  Sales of a foreign manufacturer's product in the United States made by third parties are generally insufficient to establish jurisdiction over the foreign manufacturer. See Jazini, 148 F.3d at 184 (foreign car manufacturer, Nissan Japan, is "not present in New York simply because it sells cars through a New York distributor"); McShan v. Omega Louis Brandt et Frere, S.A., 536 F.2d 516, 517-18 (2d Cir. 1976) ("[S]ales, no matter how substantial, of a foreign manufacturer's product in New York through an independent agency do not make the foreigner amenable to suit in New York . . . ."); In re Chocolate Confectionary Antitrust Litig., 674 F. Supp. 2d 580, 602-03 (M.D. Pa. 2009) (declining to exercise general jurisdiction over foreign defendant, Mars Canada, which sells nearly 85% of its products to a U.S. Mars affiliate

---

[22] Where a defendant contests the plaintiff's factual allegations, an evidentiary hearing is required, at which point a plaintiff must prove the existence of jurisdiction by a preponderance of the evidence. Metropolitan Life, 84 F.3d at 567; Ball, 902 F.2d at 197 & n.3.

F.O.B. in Canada for ultimate distribution in the United States, where the transfers between Mars Canada and the U.S. affiliate "are consummated as arms-length wholesale transactions outside of the United States," and where Mars Canada "possesses no control over [the U.S. affiliates'] distribution or promotion). Thus, in this case, the fact that a substantial quantity of crude oil produced in Nigeria is sold on the United States market by a separate entity, SITCO, does not suffice to establish general jurisdiction over SPDC. [23]   See also Kiobel, 2009 WL 3817590, at *5.

Plaintiffs contend that jurisdiction over SPDC is nonetheless appropriate, because SPDC's exclusive sales relationship with SITCO was based on an understanding (and was structured in recognition of the fact) that a substantial quantity of SPDC-produced oil would be sold in the United States. In support of this contention, Plaintiffs note that, inter alia, the price

---

[23]       A court may assert jurisdiction over a foreign corporation based on the forum contacts of an affiliate where the affiliate acts as an "agent" of the corporation. Jazini, 148 F.3d at 184. Previously, in opposition to SPDC's first motion to dismiss, Plaintiffs argued that jurisdiction could be asserted over SPDC based on SITCO's contacts with the United States, because SITCO acted as SPDC's "agent or partner rather than an arm's-length buyer" in facilitating sales of SPDC-produced oil in the United States. Plaintiffs relied on the following: (1) a SITCO letter that referred to SITCO as an "affiliate" of SPDC; (2) the fact that SPDC expressed concern for SITCO's income during negotiations with NNPC; and (3) the fact that SITCO was allegedly "losing money in its dealings with SPDC." Kiobel, 2008 WL 591869, at *7. In its March 4, 2008 Order, the Court concluded that Plaintiffs' allegations were "insufficient to establish the sort of interdependence necessary to prove the existence of an agency relationship between the two companies." 2008 WL 591869, at *7.

In opposition to the instant motion, Plaintiffs have apparently abandoned this contention, as they make no effort to establish and submit no new facts to support an agency relationship. Plaintiffs note that the oil transactions between SPDC and SITCO were "conducted through an exclusive sales agreement," but do not explain why this fact establishes an agency relationship between the companies. An exclusive sales arrangement between a foreign producer and an in-forum distributor is generally insufficient to establish agency. See Ball, 902 F.2d at 198-99 (finding no agency relationship where distributor obtained "some of its products exclusively from [defendant] and ha[d] an exclusive sales right in the United States for certain [of defendant's] products," and noting that that the distributor bore the "risk of loss associated with transporting goods to customers and enters into contracts with those customers [on its own behalf]"); see also Stutts v. De Dietrich Group, 465 F. Supp. 2d 156, 162-63 (E.D.N.Y. 2006).

Plaintiffs have also apparently abandoned the argument, advanced in their motion for reconsideration, that the use of terms "consignor" and "consignee" on bills of lading (referring to SPDC and SITCO respectively) suggested that SPDC "lent or entrusted oil" to SITCO to be sold in the United States "on behalf of SPDC." In their memorandum, Plaintiffs state simply that "[i]nterestingly," the bills of lading identify SITCO as the "shipper" and SITCO as the "consignee." It would appear that the use of the terms consignor or consignee, terms of art in the shipping context, on form shipping documents, is not determinative of the substance of the parties' transactions or the parties' relationship.

SPDC paid SITCO for oil under the Agreements was weighted to reflect that 60% of the oil would be delivered to the United States, and included an adjustment for refinery yields, processing fees, and freight charges in the United States.

It is clear that customers located in the United States buy a substantial amount of the oil produced by SPDC, and  that SPDC made business decisions with respect to their contractual arrangements and operations in Nigeria based, in part, on its expectations concerning market conditions in the United States..  However, these facts do not suffice to confer general juridction over SPDC, and Plaintiffs cite no law to suggest otherwise.[24]

B.  "Cross-posting" and employee visits

The facts submitted by Plaintiffs regarding SPDC employees being  "cross-posted" to the United States, and otherwise visiting the United States, do not suffice to confer jurisdiction over SPDC.

Generally, to become a meaningful factor for jurisdictional purposes, employee travel must occur in connection with generating, or otherwise conducting, business in the forum. SPDC's purpose in sending its Nigerian employees to the United States was for them to receive

---

[24] Plaintiffs' reliance on Kernan v. Kurz-Hasting, Inc., 175 F.3d 236 (2d Cir. 1999) is misplaced.  The question in Kernan was whether a Japanese manufacturer of a machine "said to have caused plaintiffs' injuries" was subject to personal jurisdiction in New York "where the manufacturer's distributor in Pennsylvania sold the machine to plaintiff's employer in New York."  The court found that jurisdiction was appropriate, stating that the "exclusive sales rights" agreement between the foreign manufacturer and the distributor served as evidence of the manufacturer's attempt to serve the New York market and constitutes "the type of purposeful action sufficient to support a finding of minimum contacts."  Id. at 244.  However, Kernan was decided under the court's "specific jurisdiction" (the product sold in the forum was alleged to have caused the injury), and the court applied the less stringent minimum contacts test applicable to cases decided under specific jurisdiction:  whether the party over whom jurisdiction is sought "purposefully availed himself of the privilege of doing business in the forum."  See Metropolitan Life, 84 F.3d at 568-69 (assertion of general jurisdiction demands the application of a "more stringent minimum contacts test" than that applicable to specific jurisdiction).  Kernan does not hold that an exclusive sales agreement between a foreign manufacturer and third party distributor constitutes "continuous and systematic business contacts" with the United States for purposes of asserting general jurisdiction over the defendant.

training — to increase their subsequent utility in Nigeria — and that any business they may have conducted in the course of their training was only secondary to their training.[25]  The fact that SPDC sent employees to the United States on various occasions to be trained or educated does not suffice to confer jurisdiction over SPDC.  See Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 416-19 (1984) (holding that the purchase of helicopters, equipment and training services in forum and sending the company's personnel for training to facilities in forum on a periodic basis over the course of a three-year period do not constitute continuous and systematic business contacts);  In re Chocolate Confectionary, 674 F. Supp. 2d at 603-04 (concluding that travel by foreign affiliate's executives "approximately eighty-five times per year between 2001 and 2008 . . . primarily to attend meetings, participate in group-wide conferences, and receive training from the parent organization" does not approximate physical presence in the United States);  cf. Metropolitan Life, 84 F.3d at 573 (exercising jurisdiction where defendant had sent employees to the forum state on over 150 separate occasions to provide product and sales support to authorized dealers in forum).

    With respect to "cross-posting" assignments, the facts adduced in the course of jurisdictional discovery show the following: (1) that approximately 12 SPDC employees were "cross-posted" to Shell affiliates in the United States each year from 1996 to 2004 (each staying in the United Sates for approximately four years, resulting in a total of about 50 employees being posted in the United States in any given year), (2) that assignments lasted for approximately a

---

[25] Even if the Court were to construe employee trips to the United States to supervise construction of or conduct testing with respect to certain barge/rig projects (for ultimate use in Nigeria) as conducting business in the United States on behalf of SPDC (Pls. Mem. at 24-27; Millson Ex. 19), such activity was too sporadic and occasional to constitute continuous and systematic business contacts with the forum. See Metropolitan Life, 84 F.2d at 573; see also Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1045-46 (2d Cir. 1990) (thirteen employee business trips by different employees that "occurred sporadically over a period of eighteen months" insufficient to establish continuous and systematic contact with the forum).

three year period, and (3) that when the employee was "cross-posted", his formal employment with SPDC terminated and he began employment with the host company in the United States. Various aspects of the "cross-posting" arrangement reflect an intention that the employee will return to SPDC after his service for the host company:  the letter of employment given to an employee of SPDC being "cross-posted" refers to SPDC as the home company (and Nigeria as the home county) of employment, and provides for certain benefits to make the employee whole upon his return to SPDC in Nigeria (such as pension payments and salary adjustments).

These facts do not support the exercise of personal jurisdiction over SPDC.  The approximately 50 "cross-posted" employees in the United States in any given year who come from SPDC are <u>not</u> SPDC employees when they travel to and work in the United States.  There is no evidence that SPDC engages in any support of the employee or has any supervisory responsibility over the employee while the employee is posted in the United States.  Finally, the fact that "cross-posting" serves SPDC's corporate objectives — by increasing the competence and leadership experience of the Nigerian workforce (to ultimately benefit SPDC's business <u>in Nigeria</u>) — does not constitute continuous and systematic contact with the United States.

Thus, the fact that some SPDC employees were "cross-posted" to Shell affiliates in the United States, and that other SPDC employees traveled at various times to the United States for education and/or training, does not constitute continuous and systematic business contacts with the United States as required for the assertion of jurisdiction over SPDC.

C.  <u>Recruitment of candidates for employment by SPS</u>

Plaintiffs have not submitted facts sufficient to demonstrate that SPS in Houston is an agent of SPDC, or that SPS's efforts in the United States to recruit employees to work for SPDC rose to the level of continuous and systematic business contacts with the United States.

The Court found in its March 4, 2008 Order that "although Plaintiffs label SPS an 'agent' of SPDC, they allege no facts detailing the purported agency relationship between the two entities," and that the Court would "not credit such conclusory allegations on a motion to dismiss." Id. at *8. Plaintiffs have come forward with no new facts to support the existence of such an agency relationship; indeed, the facts adduced in discovery appear to demonstrate the absence of such a relationship.[26] Two of the most important factors in determining whether agency exists are (1) whether the purported agent has the power to bind the principal, Ball, 902 F.2d at 198-99, and (2) whether the agent is "primarily employed by [the principal] and not engaged in similar services for other clients," Wiwa, 226 F.3d at 95. Here, Plaintiffs have not alleged (and the facts do not suggest) that SPS could bind SPDC in recruiting matters. Rather, SPDC made all final hiring decisions. See Alkhulaqi v. Ocean Ships, Inc., No. 95-Civ-10458 (RPP), 1996 WL 403057, at *2 (S.D.N.Y. July 18, 1996) (defendant not "doing business" in forum through third-party recruiter because recruiter lacked the ability to make binding employment decisions). Furthermore, SPS was not primarily employed by SPDC; rather, performed recruiting for Shell companies worldwide.

However, even if the Court were to impute SPS's activities in the United States to SPDC for jurisdictional purposes, such activity would in this case be insufficient to confer general jurisdiction over SPDC. The evidence submitted shows that SPDC did a majority of its recruiting in Nigeria. In 2002, 2003, and 2004, it appears that SPS recruited no employees for SPDC from the United States. Plaintiffs' conclusory assertion that SPDC "continuously and systematically recruited staff in the United States through the offices of [SPS] in Houston,

---

[26] An agency relationship exists between a foreign corporation and an affiliate where the affiliate "renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000).

Texas" (Pls. Mem. at 2) should not be credited.  See Kiobel, 2008 WL 591869, at *3 ("[T]he

Court will not draw 'argumentative inferences' in plaintiff's favor, nor will the Court accept

conclusory allegations as support for the exercise of personal jurisdiction.")

CONCLUSION

      For the reasons stated above, the Court GRANTS SPDC's motion to dismiss (Dkt. No

320), and AFFIRMS Magistrate Pitman's April 16, 2010 Order (Dkt. No. 354).  The facts

averred by Plaintiffs, assessed as a whole, do not suffice to establish a prima facie case of

personal jurisdiction over SPDC.


      SO ORDERED.

Dated: New York, New York
      June **21** , 2010

                                 Kimba M. Wood
                                 United States District Judge